HENRY C. HAARSTICK, RESPONDENT, *v.* MOYLAN C. FOX, EXECUTOR, APPELLANT.

SALE.—OFFER TO SELL.—ACCEPTANCE.—Where a deceased before her death had written to a party offering to sell certain stock at a figure stated by her, which offer was accepted by the

party, although the stock was not to be delivered by her for forty days, *held* that the sale was complete upon acceptance of the offer to sell.

ID.—ID.—DEATH OF VENDOR.—Where a party to whom stock is offered at a certain figure accepted the offer, and thereupon, before the vendor's death, deposited a notification in the mail addressed to the vendor, which letter was not received by the vendor before her death, *held* that the death of the vendor did not affect the transaction. The transaction was complete when the offer was accepted.

ID.—FIDUCIARY RELATION.—DIRECTOR AND STOCKHOLDER.—There is no fiduciary relation existing between the director and a stockholder of a company in regard to transactions affecting the sale of its stock by a stockholder to a director, and so long as the director remains silent and does not actively mislead the stockholder, the transaction cannot be set aside for fraud, and an answer setting up such facts raises no issue of fraud.

PRINCIPAL AND AGENT.—SALE.—CONFIDENTIAL RELATION.—The fact that a vendor has written to a person as a friend, asking advice and soliciting friendly offices in the sale of certain stock, and no relation of principal and agent was created beyond this, and thereupon the person written to himself makes an offer for the stock, knowing certain facts which will probably cause a rise in the price of the stock, which offer is accepted by the vendor, who writes to the purchaser to that effect, and the purchaser replies that he will pay the money upon delivery of the stock, which the vendor states will be made in forty days, *held* that the sale was complete, and not affected by the death of the vendor before receiving the purchaser's last letter, that no confidential relation existed between the vendor and purchaser, even although the vendor was a stockholder and the purchaser a director in the corporation whose stock was the subject of the transaction.

APPEAL from a judgment of the district court of the third district and from an order refusing a new trial, Hon. Charles S. Zane, judge.

The whole correspondence shown in evidence between deceased and plaintiff was as follows: Dec. 31, 1889, Mrs. McKibben to Haarstick: "As I think I may wish to dis-

pose of the Miss. Valley Trans. Co. stock, will you be so kind as to inform me if there is a market for such stock and what the market value." Jan. 2, 1890, Haarstick to Mrs. McKibben: "In reply I would state that it might take thirty or sixty days to place so large a block of the stock, but I think I could place it in that time at from $65 to $70 per share. If you conclude to dispose of your interest, and will send the stock to me, I will be pleased to sell it for you." Jan. 10, 1890, Mrs. McKibben to Haarstick: "I am in no hurry to dispose of it, and may conclude not to do so. Will be in St. Louis some time before the 20th, when I shall take the pleasure of calling on you." Jan. 27, 1890, Mrs. McKibben to Haarstick: "Upon reflection I think the Mississippi Valley stock worth more than the price you named. Let me know if that is the very best you can do." Feb. 5, 1890, Haarstick to Mrs. McKibben: "With regard to our barge stock, all I can say is that the figure I mentioned is about as much as you could realize, in my opinion. We are beginning to feel a new all-rail Kansas City to N. O., the competition of which via Memphis, I fear, will eventually injure us badly." Feb. 1, 1890, Haarstick to Mrs. McKibben, a letter making no mention of the stock. Feb. 7, 1890, Haarstick to Mrs. McKibben, a letter containing no mention of the stock. Feb. 10, 1890, Mrs. McKibben to Haarstick: "I have concluded to sell Miss. Valley Trans. stock for $100,000 (one hundred thousand dollars). If you accept, how long will it take to complete the sale?" Feb. 19, 1890, Haarstick to Mrs. McKibben, the letter set out in the opinion. Feb. 25, 1890, Mrs. McKibben to Haarstick, the letter set out in the opinion; and March 1, 1890, Haarstick to Mrs. McKibben, the letter set out in the opinion.

The court found the following facts: That the sale for $92,500 was complete by the letters dated February 25, 1890, and March 1, 1890, and that the stock on April 10,

1890, was of the value of $104,500 and plaintiff was damaged in the sum of $12,000, with interest, besides other facts necessary to support the judgment.

*Messrs. Bennett, Marshall and Bradley,* for the appellant.

The contention of plaintiff that an uncommunicated assent completed the contract is supported by the weight of authority in this country, but not by the best reasoned authority. *Brogden* v. *Metropolitan Railway,* 2 App. Cas. 688; *Telegraph Co.* v. *Colson,* L. R. 6 Exch. Cas. 108, Reedpath's Case, L. R. 11 Eq. Cas. 86; *McCullough* v. *Insurance Co.,* 1 Pick. 278, Langdell on Contracts (2 Ed.) 989–996. A confidential relation existed between the parties, because stock holder and director. The contrary view is supported by two cases. *Carpenter* v. *Danforth,* 52 Bart. 581, and *Tippecanoe Co.* v. *Reynolds,* 44 Ind. 509. The first case is criticised and disapproved in Perry's note to 1 Story Eq. Jur., sec. 229 (12 Ed.) But this case is differentiated from those two cases by the fact that there was a special confidence reposed. *Tate* v. *Williamson,* L. R. 2 Ch. App. 55; *Mallory* v. *Leach,* 35 Vt. 156 (82 Am. Dec. 625).

The court erred in failing to find upon the issue of fraud tendered in the answer. *Peo* v. *Forbes,* 51 Cal. 628, 2 Comp. Laws 1888, sec. 3379, Hayne on New Trial, 718–722; *Campbell* v. *Buckman,* 49 Cal. 367; *Railway Co.* v. *Reynolds,* 50 Cal. 93; *Dowd* v. *Clarke,* 51 Cal. 263; *Everson* v. *Mayhew,* 57 Cal. 144.

*Messrs. Richards, Moyle and Richards,* and *Messrs. Brown and Henderson,* for the respondent.

8

MINER, J.:

The record in this case presents the following facts: Joab Lawrence died testate, December 28, 1888, being at the time of his death the owner of 1,414 shares of the capital stock of the St. Louis & Mississippi Valley Transportation Company, a Missouri corporation. His widow and devisee thereafter remarried, and became Sarah McKibben. The plaintiff was president of the transportation company, an acquaintance of Joab Lawrence and Mrs. McKibben, and who assisted her in other matters of business in St. Louis, when requested, and who offered his services to her in any matter of business connected with the ascertainment of the true signature of Mr. Lawrence, as a friendly act, but without any compensation. The plaintiff resided in St. Louis; had been president of the transportation company since its organization, in 1881, and was reasonably familiar with its business and finances. The stock of the company was not listed on any stock exchange; had a market in St. Louis alone, and among those acquainted with the business of the company. Mrs. McKibben resided in New York. In the months of January and February, 1890, the financial condition of the transportation company was good, and its business reasonably prosperous, although in the latter month it met with a serious loss, in the sinking of the Port Eads, a steamer towing its barges. The plaintiff's witnesses swear that on March 10, 1890, stock in the transportation company was worth from $65 to $70 per share, and on April 10, 1890, from $75 to $80 per share. On June 21, 1890, the company paid a dividend of 6 per cent., or $6 per share, on its capital stock, which was the highest dividend ever paid by it, with the exception of one of equal amount in 1884.

On December 31, 1889, Mrs. McKibben, then residing in New York, wrote to plaintiff, at St. Louis, that she

might wish to dispose of the transportation company stock, asking if there was a market for it, and what the market value of the stock was. On January 2, 1890, the plaintiff replied "that it might take thirty or sixty days to place so large a block of the stock, but I think I could place it in that time at from $65 to $75 per share. If you conclude to dispose of your interest, and will send the stock to me, I will be pleased to sell it for you." On January 10, 1890, Mrs. McKibben replied. that the "captain" (her late husband, Joab Lawrence) always quoted the stock at par, and she might conclude not to sell. On January 27, 1890, she again wrote to plaintiff concerning other business, concluding as follows: "Upon reflection, I think the Miss. Valley stock worth more than the price you named. Let me know if that is the very best you can do." On February 5, 1890, the plaintiff replied, answering her former letter, and concluding as follows: "With regard to our barge stock, all I can say is that the figure I have mentioned is about as much as you could realize, in my opinion. We are beginning to feel a new all-rail Kansas City to N. O., the competition of which via Memphis, I fear, will eventually injure us badly." On February 10, 1890, Mrs. McKibben wrote plaintiff as follows: "I have concluded to sell Miss. Valley Trans. stock for $100,000 (one hundred thousand dollars). If you accept, how long will it take to complete sale?"

On February 19, 1890, plaintiff wrote Mrs. McKibben, in substance, that the transportation company had met with a "terrible loss at Memphis; the Port Eads having struck a pier of the new bridge there, and being a total loss. In addition, one barge was sunk, besides another badly hurt. The tow was caught and landed, but it may cost us considerable for salvage, and as we carry our own insurance it may take all of $75,000 to make good the loss. This is equal to four per cent. on our stock, and in addi-

tion to this it will not be very easy now to dispose of it readily, as parties who might have bought will be fearful on account of accidents in the future. If you will sell the 1,414 shares belonging to the estate for $92,500, I will undertake to dispose of them inside of sixty days, but must request an answer by return mail; also, if you will sell, would request that you send the stock, properly indorsed, by express, to me, at the same time." On February 25, 1890, Mrs. McKibben wrote plaintiff as follows: "Your favor, making offer of $92,500 (ninety two thousand and five hundred dollars) for the 1,414 shares of Miss. Trans. stock, received, and I say in reply that I accept your offer, but cannot deliver the stock under forty days. The probate laws here are such that I must wait until I get possession of the stock; otherwise, it would have to be sold here at public auction." On March 1, 1890, plaintiff wrote Mrs. McKibben as follows: "I am in receipt of your letter dated 25th February, accepting my offer of $92,500 (ninety-two thousand and five hundred dollars) for the 1,414 shares of St. Louis, Miss. Valley Transportation Co. stock, belonging to the estate of Joab Lawrence, but that you could not deliver it for forty days from date of your letter. This is perfectly satisfactory to me. When you obtain possession you can draw on me at sight for the amount, with certificates of stock attached, or, if you prefer, I will deposit the amount in any one of our banks you may designate, on delivery of the stock to me," etc.

This letter of March 1st reached Salt Lake City, where Mrs. McKibben then was, on March 4, 1890. Mrs. McKibben died on the morning of March 5, 1890, having been unconscious for 24 hours before her death, and she never saw the letter. After her death this letter came into the hands of her administrator and son-in-law, the defendant. The defendant also found inclosed in another letter directed

to her a newspaper account of the loss of the Port Eads, although plaintiff denies having sent it to her. Plaintiff filed his claim against the estate under the statute, and it was rejected. The estate refused to deliver the stock. Plaintiff brought suit for a breach of the alleged contract of sale, claiming that the difference between the contract price and the market price when the stock should have been delivered, viz., April 10, 1890, was $27,690; recovered judgment before the court for $13,485, including interest. The appellant contends that the evidence is insufficient to justify the findings and judgment, because: (1) The evidence shows that defendant's testatrix did not contemplate a sale to plaintiff, but an employment of him as her agent to dispose of stock for her. (2) Because plaintiff's letter of March 1, 1890, was never received by defendant's testatrix, and plaintiff's acceptance never communicated to her. (3) Because, if the letters in question are held to constitute an agreement to sell to plaintiff, still the evidence further shows that a confidential relation subsisted between plaintiff and Mrs. McKibben, which raises a presumption of fraud in the contract, which presumption can only be rebutted by proof that plaintiff, prior to the contract, fully disclosed to Mrs. McKibben all his information relative to the value of the stock in question, and the proof is that he did not make such disclosures.

The questions of law involved in this case require the construction of the letters heretofore referred to, and the rights of the plaintiff to recover, under the circumstances shown. Mrs. McKibben claimed to be the owner of 1,414 shares of capital stock of the St. Louis & Mississippi Valley Transportation Company. It does not appear that plaintiff knew the nature of her ownership at the time in question, accept by what appears by Mrs. McKibbin's letters to him. It does appear that Mrs. McKibben commenced negotiations with plaintiff in December, 1889, look-

ing to the sale of this stock, and desiring to know whether or not there was any market for it, and what it was. It does not appear that plaintiff was to have any compensation for his services in making a sale, or that any broker should do the business as agent. Plaintiff answered January 2, 1890, saying it would take 30 days' time to place it, but he thought he could place it in that time at $65 to $70 per share. Her reply to this indicates that she thought it worth more. Without any answer to his letter, she again writes plaintiff, on January 27, 1890: "Upon reflection, I think the stock worth more than the price named. Let me know if this is the very best you could do." This letter would indicate that she was expecting the plaintiff to make the purchase, and that the offer of $65 to $70 was made by him. On February 5, 1890, plaintiff wrote that in his opinion the offer made was as much as she would be able to realize, giving the reason that they were beginning to feel the effects of new competition, etc. Other letters passed, upon matters not connected with this issue, and on February 10th she writes, offering the stock at $100,000, and concluding, "If you accept, how long will it take to complete sale?" On February 19, 1890, plaintiff answers this letter, giving an account of the loss of the Port Eads, which would affect the stock, but stating he would undertake to dispose of the stock at $92,500 within 60 days, but wants an immediate answer, with stock inclosed, and sent to him by express, at the same time. She replied on February 25, 1890, saying: "Your favor, making offer of $92,500 for 1,414 shares of stock, received; and I say in reply that I accept your offer, but cannot deliver the stock under forty days," etc.

These letters seem to show good business ability on her part. She fixes the value upon the stock much in excess of that which is offered, after which she declines to accept the offer made. She then names the value placed upon

the stock by her late husband, in excess of the amount offered; afterwards declines to sell; then follows with an offer to take $100,000. Obtains a definite offer of $92,500, and at once accepts it, with a condition as to delivery. It does not appear from the record nor from the correspondence that the plaintiff stood in any other relation to her than as a business man of affairs, willing to answer any questions or perform any service that a gentleman could ordinarily perform for an acquaintance, without such compensation as an ordinary business relation would permit. And while it is urged by appellant's counsel that owing to plaintiff's official relations with the company; his extensive knowledge of the affairs of the company; the increased value of its stock at the time of its promised delivery; his statements as to the loss of the Port Eads, the building of competing lines of railroad, and their consequent effect upon the value of the stock,—had a direct tendency to mislead Mrs. McKibben, and cause her to sell the stock below its value, yet, upon a careful review of the testimony, we are unable to find any statement or representation on the part of the plaintiff that has been shown to be untrue, or any act that has been shown to be fraudulent. It is not shown, nor can it be presumed from the testimony, that the plaintiff had any secret knowledge as to the value of the stock, actual or prospective, as would raise any presumption of fraud against him; such as would cast upon him the burden of showing a full disclosure of any knowledge he possessed concerning it. The price agreed to be paid is shown to have been the fair value of the stock at that time.

As a business proposition, we know that it is seldom that any kind of stock has a fixed, certain, unchangeable value for any considerable length of time. They fluctuate in value as this stock did, and might be expected to fluctuate. The broker who assumes to know the most about

them is frequently the first one to be deceived. Had this stock declined, instead of having appreciated in value, after the sale, it is quite certain that, under the facts shown, Mrs. McKibben could have received from the plaintiff the price agreed upon, or damages consequent upon his failure to perform his contract. This rule is laid down in Cook on Stock & Stockholders (sections 320, 351),—that " a director of the corporation itself may buy and sell its stock like any other individual. The information which he has of the affairs of the corporation, whereby he is enabled to buy or sell at an advantage over the person with whom he deals, does not affect the validity of the transaction. He is entitled to the benefit of his facilities for information. There is no confidential relation between him and the stockholder, so far as a sale of stock between them is concerned; and as long as he remains silent, and does not actively mislead the person with whom he deals, the transaction cannot be set aside for fraud." *Gillett* v. *Bowen,* 23 Fed. Rep. 625; Morawetz on Corp. 565; *Deaderick* v. *Wilson,* 8 Baxt. 108; *Commissioners* v. *Reynolds,* 44 Ind. 509; *Carpenter* v. *Danforth,* 52 Barb. 581; 2 Pom. Eq. Jur. 902–904; *Allen* v. *Gillette,* 127 U. S. 589, 8 Sup. Ct. Rep. 1331. The testimony shows that there was a plain offer on the part of the plaintiff to buy the stock at $92,500, on the condition Mrs. McKibben would sell at that price, and that Mrs. McKibben accepted that offer, with the condition that she should have 40 days in which to deliver it. From the language used, she must have understood that the plaintiff was buying, and he must have understood that she was selling, the stock, at the price offered and accepted.

The condition inserted by her required a new acceptance from the plaintiff, and on the 1st day of March, 1890, the plaintiff did accept the conditions and offer as a whole. This last letter, of March 1st, in acceptance of her offer of

February 25th, was mailed the same day it was written, and reached Salt Lake City, where Mrs. McKibben then was, by due course of mail, on March 4, 1890. Mrs. McKibben died March 5, 1890, having been unconscious for 24 hours, and never saw the letter. The appellant contends that, while Mrs. McKibben accepted plaintiff's offer of $92,500 for the stock, yet she added a condition to that acceptance which required a new acceptance from the plaintiff, and the contract would not be consummated until plaintiff had not only mailed his acceptance of it, but such acceptance must have been actually communicated to Mrs. McKibben,—in other words, that the assent of Mrs. McKibben, either express or implied, after the acceptance of the terms proposed by her, is essential to the consummation of the contract. In our view of the law, this cannot be sustained. An unqualified acceptance by the one party of the terms proposed by the other party, transmitted by the usual due course of mail, must be regarded as closing the bargain, from the time of the mailing or transmission of the acceptance by mail, and that it is wholly immaterial whether the party proposing ever saw such acceptance or not. We are but following the doctrine well established in this country, and as plainly laid down in *Tayloe v. Insurance Co.,* 9 How. 390, when we say that an offer, under the circumstances shown, was a valid undertaking on the part of Mrs. McKibben that she would be bound according to the offer tendered, if an answer thereto was transmitted, in due course of mail, accepting the offer; and, as held in the case of *Tayloe v. Insurance Co.,* such offer cannot be withdrawn unless the withdrawal reaches the party to whom it is addressed before his letter of reply, announcing the acceptance, has been transmitted.

In the same case the court say that, "on the acceptance of the terms proposed, transmitted by due course of mail to the company, the minds of both parties have met on

the subject, in the mode contemplated at the tine of entering upon the negotiation, and the contract becomes complete.     The party to whom the proposal is addressed has a right to regard it as intended as a continuing offer until it shall have reached him, and shall be in due time accepted or rejected.     Such is the plain import of the offer.     And, besides, upon any other view, the proposal amounts to nothing, as the acceptance would be but the adoption of the terms tendered, to be in turn proposed by the applicant to the company for their approval or rejection.     The fallacy of the argument, in our judgment, consists in the assumption that the contract cannot be consummated without a knowledge on the part of the company that the offer has been accepted.     This is the point of the objection.     But a little reflection will show that in all cases of contracts entered into between parties at a distance, by correspondence, it is impossible that both should have a knowledge of it the moment it becomes complete.     This can only exist where both parties are present.     It is obviously impossible, therefore, under the circumstances stated, ever to perfect a contract by correspondence, if a knowledge of both parties, at the moment they become bound, is an essential element in making out the obligation.     And as it must take effect, if effect is given at all to an endeavor to enter into a contract by correspondence, in the absence of the knowledge of one of the parties at the time of its consummation, it seems to us more consistent with the acts and declarations of the parties·to consider it complete on the transmission of ·the acceptance of the offer in the way they themselves contemplated, instead of postponing its completion till notice of such acceptance had been received and assented to by the company." The unqualified acceptance of one, of the terms proposed by the other, transmitted by due course of mail, is regarded as closing the bargain, from the time of

the transmission of the acceptance. This is the American doctrine. 3 Amer. & Eng. Enc. Law, p. 856; 1 Pars. Cont. p. 28; *Eliason* v. *Henshaw*, 4 Wheat. 225; *Mactier's Adm'rs* v. *Frith*, 6 Wend. 103; *Ferrier* v. *Storer*, 63 Iowa, 484, 19 N. W. Rep. 288; *Hunt* v. *Higman*, 70 Iowa, 406, 30 N. W. Rep. 769; *Linn* v. *McLean*, 80 Ala. 360.

It is contended that the court erred in failing to find facts on the question of fraud set up in the answer. The court found, separately and specifically, that the contract set up in the complaint was sustained by the evidence. This finding necessarily negatives a fraud, as alleged, and is sufficient to sustain the judgment. *Kisling* v. *Shaw*, 33 Cal. 425; *Malone* v. *County of Del Norte*, 77 Cal. 217, 19 Pac. Rep. 422; *Diefendorff* v. *Hopkins*, 95 Cal. 347, 28 Pac. Rep. 265, and 30 Pac. Rep. 549; *Brison* v. *Brison*, 90 Cal. 323, 27 Pac. Rep. 186; *Maxfield* v. *West*, 6 Utah, 327, 379, 23 Pac. Rep. 754, and 24 Pac. Rep. 98.

Upon the whole record we find no error. The judgment of the trial court is affirmed, with costs.

BARTCH, J., concurred.