LINGQUIST, APPELLANT, *v.* LOBLE, EXECUTOR, RESPONDENT.

ON REHEARING.

(Submitted January 5, 1922.  Decided January 23, 1922.)

[204 Pac. 175.]

*Real  Property — Brokers — Commissions — Contracts — Acceptance — Letter Placed in Mail.*

Real Property—Broker's Contract—Acceptance—Letter Placed in Mail.
  1.  A letter placed in the mails, postage prepaid, by a real estate broker, addressed to the owner of lands at his postoffice seven miles away, which lands had been placed with him for sale under a written contract which had still four days to run, notifying defendant that he had found a purchaser ready, able and willing to pay the purchase price fixed by the contract, was binding upon defendant the moment it was placed in the postoffice and constituted an acceptance of the offer embodied in the contract.

Same—Notice of Acceptance—Sufficiency—Breach of Contract—Evidence —Sufficiency.
  2.  Where the evidence of plaintiff and his witnesses in an action to recover commissions claimed to have been earned on the sale of lands was positive and uncontradicted that in addition to the notice referred to above, the purchaser himself had written to defendant

---

1.  Right to withdraw letter from the mail as affecting consummation of contract, see note in 9 A. L. R. 386.
2.  When has a broker earned his commission, see note in 139 Am. St. Rep. 225.
Right of broker to commission where sale defeated by act of the owner, see notes in 2 Ann. Cas. 184; 20 Ann. Cas. 1024.

notifying him that he was ready to buy and pay for the land, that plaintiff, the purchaser and two others went to defendant's ranch about three miles distant from his postoffice on two occasions before the expiration of the contract but could not find him and therefore each time left a notice that his offer had been accepted, while that of defendant was evasive but admitting that after the expiration of the contract he had sold the land for ten dollars an acre above the price stipulated in it, the court erred in refusing to instruct the jury to return a verdict in favor of plaintiff.

Same—What is not Conditional Acceptance.

3. The offer made by the buyer in his letter of acceptance that he would either pay the entire purchase price to the owner, the latter to pay off an outstanding mortgage, or that he would pay off or assume the mortgage and pay him the balance, *held* not a condition attached to the acceptance but more in the nature of an option for the accommodation of the seller, and therefore not a ground for refusal to sell.

ORDER denying new trial reversed and cause remanded, with directions to set aside judgment in favor of defendant and to enter judgment for plaintiff, with interest.

MR. JUSTICE COOPER delivered the opinion of the court.

Since the former decision, Lester H. Loble, as executor of the last will and testament of John W. Seibold, has been substituted as respondent. We adopt the statement of the issues found in the opinion of Mr. Commissioner Spencer.

Appellant's contention is that the proof conclusively shows that, pursuant to the terms of, and within the time specified in, the contract involved, he procured a purchaser ready, able and willing to buy the land of defendant, and that the trial court should have directed a verdict in his favor. If this be true, a reversal of the judgment of the lower court must follow, and the former opinion of this court be overruled.

The contract is admitted. By its terms its force was spent [1] on the fourteenth day of March, 1915. Did the plaintiff perform his part, and did the defendant observe his obligations thereunder? The following is undisputed: On March 10, 1915, Lingquist deposited in the postoffice in the city of Helena, addressed to the defendant at East Helena, his postoffice, an envelope containing a notice, which (omitting the signature and the formal parts) reads as follows: "I have found a pur-

chaser for the ranch mentioned in my contract with you, dated March 14,, 1912, who is willing to pay for the ranch on the terms therein mentioned, and I therefore demand that you transfer the ranch to him and accept the purchase price." The contents of the letter were a notice to O'Neill and binding upon him the moment it was deposited in the mail at Helena. (*Long* v. *Needham,* 37 Mont. 408, 96 Pac. 731; 1 Page on Contracts, sec. 201; *Henthorn* v. *Fraser,* 2 Ch. Div. 27; *Haarstick* v. *Fox,* 9 Utah, 122, 33 Pac. 251; *Otis* v. *Payne,* 86 Tenn. 663, 8 S. W. 848; *Brauer* v. *Shaw,* 168 Mass. 198, 60 Am. St. Rep. 387, 46 N. E. 617; 1 Page on Contracts, 2d ed., secs. 199–201; *Tayloe* v. *Insurance Co.,* 9 How. (U. S.) 390, 13 L. Ed. 187 [see, also, Rose's U. S. Notes]; *Abbott* v. *Shepard,* 48 N. H. 14.)

In the case first cited this court sustained an action for the specific performance of a contract for the sale of land, upon the theory that on negotiations between the parties their minds met and a contract was consummated. On April 4 the plaintiff mailed a letter addressed to the defendant, in which he offered to purchase defendant's ranch in Fergus county at a price theretofore agreed upon, closing with these words: "If this meets with your approval write me at once and say so, or better wire me, and follow with letter." · Upon receipt of the letter, the defendant wired: "Offer accepted, will send papers Fergus County Bank for signature."

In the Tennessee case Otis inquired of Payne by letter what he would take for a described tract of land on specified terms. Payne replied by letter that he would take $2,500 for the land on the terms mentioned. Otis promptly accepted the proposition by letter. The court held that the contract of sale was complete and irrevocable from the date of the mailing of the acceptance. In passing upon the question, the court very aptly remarks: "Payne's letter was a continuing offer until received, and for a reasonable time thereafter. It was not binding on him until accepted, and before that he might have withdrawn it at any moment. But, when Otis accepted it and

mailed his letter announcing the fact, he at once became entitled to all the benefits of his bargain.''

In the English case the facts were these: On July 7, 1891, the defendant gave to plaintiff an offer in writing to sell him certain real estate. On the 8th plaintiff's solicitor, by his direction, wrote defendant accepting the offer. The letter was mailed at 3:50 P. M. but did not reach the office until after business hours and was not opened until 10 o'clock the next morning. In the meantime the defendant had written the plaintiff withdrawing the offer on the same 8th of July and posted the letter between 12 and 1 P. M. On the same day the defendant entered into a contract to sell the same property to another person. As to the acceptance, it was held that by the notice the acceptor had done all that he was bound to do; Lord Herschell announcing the rule to be: ''That where the circumstances under which an offer is made are such that it must have been within the contemplation of the parties that, according to the ordinary usages of mankind, the post might be used as a means of communicating the acceptance of it, the acceptance is complete as soon as it is posted.'' And so it is of the transaction before us. It was a contract in writing the subject of which was the sale of real estate. It was, however, silent as to the place and manner of its fulfillment. The plaintiff resided in the city of Helena, the defendant at his ranch ten miles away from Helena; his postoffice being at East Helena, some three miles distant from the land in question. The letter of Lingquist, after deposit in the postoffice, constituted a complete acceptance of the offer embodied in the contract within the doctrine announced in the above cases.

That the offer contained in the letter of Hanson was clear [2] and in full response to the requirements of the writing between the plaintiff and the defendant is apparent from a comparison of its language with that of the contract. The letter reads: ''This is to notify you that I have examined your ranch at the request of Mr. F. W. Lingquist. I am ready and willing to close the deal with you on your ranch mentioned in

said option at $25.00 per acre, and I will pay the entire purchase price to you, and you may pay off the mortgage and keep the balance, or I will either pay off or assume the mortgage at your option and the mortgagee's option. I have made three trips for the purpose of closing the deal, but have been unable to find you at home, so I left a note at your home with instructions to your man in charge there to deliver it to you at once, which note was to the effect that I was ready to buy as above mentioned. Kindly advise me upon receipt of this when you will make me deed and accept the purchase price.''

The plaintiff and Hanson, in their efforts to notify O'Neill that the latter was ready, willing and able to purchase the ranch, went still further, for, on March 10, accompanied by the witnesses Bayerd, Taylor and Carlson, they went to the ranch in question, reaching there between 4 and 5 o'clock in the afternoon. The defendant was not there, so they left two written notices with a man named Beach who was employed there and apparently in charge of the place. On the following day the same five men went again to the O'Neill ranch and found Beach there; Lingquist leaving with him a notice similar in terms to that left on the previous day, and Hanson fastening the other upon the building, with his street address, 51 Pine Street, Helena, written at the foot, reading as follows: ''I am ready to buy your ranch at $25 per acre, price quoted me by F. W. Lingquist. I will pay the entire purchase price to you, and you may pay off or assume the mortgage at your option.'' On March 12 the same five persons again went to the ranch of the defendant, but failed to find him; the plaintiff testifying that they ''went through the same performance'' as on the day before. These facts stand uncontradicted in the record, and are fortified by admissions made by the defendant upon the witness-stand, as hereafter appears: On March 4 the plaintiff and Mr. and Mrs. Hanson went to the ranch to see it, with the idea of purchasing it. The defendant met them at the gate and ''told them (referring to the witnesses Taylor and Hanson) that the plaintiff had an option on the ranch for

$25 an acre," adding: "It ought to have brought more at that time, and I thought so; 'land has increased in the last two years. It was worth more than $25 an acre." He also testified that he slept in his house on the nights of March 10, 11, and 12, so that he had ample opportunity to see the notices referred to and learn of their contents; that he was "east of the haystack in the field" on the 11th when the witnesses were there. Mr. Taylor testified that he saw a man near the haystack mentioned answering Mr. O'Neill's description; the defendant admitting that he saw them when they were "coming through the field," but "didn't speak to them." The statements of the plaintiff's witnesses that they were in East Helena on the 10th of March looking for O'Neill and making inquiry as to where he could be found were corroborated by Mr. O'Shea, who was a witness for the defendant. The evidence of the plaintiff and his witnesses is of a positive character, uncontroverted in its material and important features, and is ample to establish the fact that the plaintiff, under the agreement, produced a purchaser who was ready, willing and able to purchase the property and made earnest and persistent efforts to bring him into the defendant's presence for the purposes contemplated in the contract. On the other hand, the evidence of the defendant was evasive and disclosed a studied effort to shield himself from the imputation that he was hiding from the plaintiff in an effort to prevent a sale. The defendant also admitted that after the expiration of the contract he sold the ranch for $10 an acre above the price named therein. Under these circumstances it is difficult to conceive how the plaintiff could have done more to bring his proposed purchaser and the defendant together, or to better evince his good faith in carrying out the terms of his undertaking. (*McLean* v. *Sellers,* 44 Mont. 389, 120 Pac. 242; *Van Orden* v. *Simpson,* 90 Misc. Rep. 322, 153 N. Y. Supp. 134.)

The contract imposed mutual obligations upon its makers. [3] O'Neill could remain passive until Lingquist had pro-

duced a person able, ready and willing to purchase the land in accordance with the provisions of the agreement. Until he had done so, his commission was not earned; and while O'Neill was not required to take affirmative action until the plaintiff had fulfilled his obligation by finding a purchaser, upon the mailing of the letter he had done all in his power to bring the buyer and seller face to face and bound the defendant to execute and deliver the deed upon the payment of the purchase price. Under the agreement as it is written, it could have been enforced by either party against the other. The suggestion in the Hanson letter as to how the mortgage should be taken care of had to do with the mode of carrying out the details of the agreement, and not with the making of it. (*Long* v. *Needham, supra.*) It was not a condition attached to the acceptance, but was more in the nature of an option for the accommodation of the defendant. That this is the correct interpretation of the contract is evident from the following recitals therein: "It is further agreed that second party [Lingquist] shall offer the said ranch for sale at an agreed price of $25 per acre, or such other price as the parties shall agree upon, and in case of sale second party shall render the first party [O'Neill] a complete accounting of such sale, paying a $6,000 mortgage on said ranch now existing, and all interest and costs thereto pertaining, and retaining sufficient part of the purchase price to reimburse himself for the amount of the chattel mortgage hereinbefore mentioned and interest and costs thereon, and any other costs and expenses that may become necessary to the protection and preservation of said ranch and chattels. It is further agreed that in case of sale all amounts over and above the amounts necessary to liquidate the above-described mortgages and advances in accordance with this contract shall be equally divided between the parties hereto as profits upon the sale of the land."

Both parties testified that the indebtedness owing to plaintiff had been fully settled long before the happening of the events out of which the present action arose. The unques-

tioned evidence of Mr. Pigott that Mr. Hanson was fully able to pay the purchase price and that the amount due upon the mortgage on March 15, 1915, amounted to the sum of $6,308, left no issue of fact to be determined by the jury and entitled the plaintiff to a peremptory instruction in his favor. Upon this record, the plaintiff requested the district court to give the jury the following instruction: "The uncontradicted evidence shows that on March 15, 1915, there was due on the $6,000 mortgage of O'Neill to Pigott the sum of $6,308, the difference between that sum and $12,000, the purchase price of the ranch, is $5,892; the court instructs you to find in favor of the plaintiff for one-half of that sum, or $2,846, with interest at eight per cent from March 16, 1915, the date of the commencement of this action."

There being an entire absence of conflict in the evidence upon the material points in the case, the court should have given the instruction requested.

For these reasons, the order denying a new trial is reversed and the cause is remanded, with directions to set aside the judgment in favor of defendants and to enter judgment for the plaintiff for the sum of $2,846, with interest from March 16, 1915, at eight per cent and costs.

*Reversed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, HOLLOWAY and GALEN concur.