# PHILADELPHIA, BALTIMORE, & WASHINGTON RAILROAD COMPANY *v.* TUCKER.*

---

EMPLOYERS' LIABILITY ACT; CONSTITUTIONAL LAW; MASTER AND SERVANT; RAILROADS; COMPARATIVE NEGLIGENCE; ASSUMPTION OF RISK; DAMAGES FOR DEATH; EVIDENCE.

1. The Act of Congress of June 11, 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148), known as the "employers' liability act," is constitutional in so far as it relates to carries engaged in business in the District of Columbia and the territories. (Following *Hyde* v. *Southern R. Co.* 31 App. D. C. 466.)

2. While a fireman employed by a railroad company in this District is rightfully and necessarily on the company's premises on his way to assume his duties, to which he has been called by the company, the relation of master and servant exists between him and the company, within the contemplation of the employers' liability act of Congress of June 11, 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148).

---

*As to what constitutes a defect in the "ways" of a railroad company within the employers' liability act, see note to *Hubbard* v. *Central R. Co.* 19 L.R.A. (N.S.) 738.

As to servant's assumption of risk of master's breach of statutory duty, see notes to *Denver & R. G. R. Co.* v. *Norgate,* 6 L.R.A. (N.S.) 981; *Johnson* v. *Mammoth Vein Coal Co.* 19 L.R.A. (N.S.) 646; and *Hill* v. *Saugestad,* 22 L.R.A. (N.S.) 634.

For method of authenticating mortality tables, see note to *Notto* v. *Atlantic City R. Co.* 17 L.R.A. (N.S.) 1138.

3. Under sec. 1 of the employers' liability act of Congress of June 11,
    1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909,
    p. 1148), making every common carrier engaged in trade or com-
    merce in this District liable to any of its employees for damages re-
    sulting by reason of any defect or any "insufficiency" due to its
    negligence, in its "ways" or works, a path on the premises of a
    railroad company, and over its tracks, whether established by itself
    or others, and used with its knowledge and consent, for a long period
    of time, by its employees in going to and coming from their work,
    is a "way," which may be said to be insufficient if it is not properly
    guarded by watchmen, signals, or otherwise, to protect from injury
    the employees using it. (Citing *Baltimore & P. R. Co.* v. *Golway*,
    6 App. D. C. 143, and *Glaria* v. *Washington Southern R. Co.* 30 App.
    D. C. 559.)

4. In an action against a carrier under the employers' liability act of
    Congress of June 11, 1906 (34 Stat. at L. 232, chap. 3073, U. S.
    Comp. Stat. Supp. 1909, p. 1148), for the death of one of its em-
    ployees resulting from its negligence, the trial court properly permits
    the jury to compare the negligence of the decedent with the negli-
    gence of the defendant, and to render a verdict in favor of the
    plaintiff, if they find that the negligence of the decedent was slight,
    and that of the defendant gross,—the damages, however, to be
    diminished in proportion to the amount of the negligence attributable
    to the decedent.

5. The doctrine of assumption of risks in the law of master and servant,
    which results from the contractual relation of the parties, cannot
    be successfully interposed as a defense by a carrier to an action
    under the employers' liability act of Congress of June 11, 1906 (34
    Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148),
    for the death of one of its employees, by reason of its alleged negli-
    gence, in view of the provision of sec. 3 "that no contract of employ-
    ment * * * shall constitute any bar or defense to an action
    brought to recover damages for personal injuries or death of such
    employee;" and the subsequent employers' liability act of Congress
    of April 22, 1908 (35 Stat. at L. 65, chap. 149, U. S. Comp. Stat.
    Supp. 1909, p. 1171), is not to be interpreted as a legislative dec-
    laration that the prior act does not do away with the doctrine,
    in so far at least as the injury forming the basis of the action may
    have resulted from the negligence of the carrier.

6. A verdict in an action for damages for wrongful death is not erroneous
    because there was no direct evidence as to the age or health of the
    decedent's widow, or the health of her infant child born shortly after
    the death of the decedent, nor evidence as to their probable duration

of life, where the widow appeared before the jury as a witness and the evidence showed the age of the decedent.

7. While annuity or life tables are admissible in evidence in an action to recover damages for wrongful death, they are not controlling.

No. 2053.   Submitted March 5, 1910.   Decided April 6, 1910.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, upon verdict, in an action for damages under the employers' liability act of Congress of June 11, 1906, for the death of plaintiff's intestate.                                                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal [by Lillian Tucker, administratrix,] from a judgment of the supreme court of the District of Columbia upon a verdict for $5,000, against appellant, the Philadelphia, Baltimore, & Washington Railroad Company, defendant below, in an action under the employers' liability act of June 11th, 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148), for the recovery of damages resulting from the alleged negligent killing of plaintiff's intestate, Sidney R. Tucker, in the early morning of August 26, 1907, as he was crossing the defendant's tracks on his way to assume his duties as fireman in response to a call from the defendant to report for that purpose.

In 1905, during the progress of elevating and depressing its tracks along Virginia avenue and excavating tunnels leading to the Navy Yard and through the Capitol grounds, the defendant company built along the north side of Virginia avenue, which was the south side of Garfield park, a stone wall varying in height from 4½ to 20 feet, and about 2 feet in thickness. This wall extended from the west portal of the Navy Yard tunnel beyond East Capitol street. About 840 feet west of the tunnel, an opening about 80 feet wide was left in this wall, primarily to admit a side track leading out into Garfield park, which track was used in connection with construction work.

Immediately adjacent to this wall were the two main tracks of the defendant company, the one the nearer to the wall leading westwardly from the tunnel toward the Sixth street station, and the second track leading in the opposite direction. Beyond these two tracks there was a spur track which accommodated the "Annex," or work train, which carried the freight crews to and from work. The evidence shows that this train usually stopped about opposite the opening in the wall, for the purpose of receiving the train crews and other workmen. About 370 feet southwest of this opening in the wall, and quite near said main tracks, stood the so-called ND tower, from which signals were displayed for trains approaching from the direction of the tunnel. About 560 feet west of said opening was South Capitol street, at which point the tracks were elevated above the street. About 750 feet southwest of said opening was a roundhouse or engine house of the defendant company, and between this house and said opening was a network of tracks forming what was called the Jersey yards, where passenger cars were stored. North of said opening in Garfield park was one path leading directly to the opening. The evidence shows that this opening, for two years prior to the accident, had been used constantly not only by the men riding on said Annex, but by the other employees of the defendant company in going to and in returning from their work in said Jersey yards and roundhouse. The evidence bearing upon this phase of the case will be considered more in detail later.

Tucker entered the employ of the defendant company in July, 1907, as an extra locomotive fireman, and, while his work appears to have been regular and constant, he was nevertheless paid by the trip. Except upon one occasion, when he was summoned by telephone for passenger train service, he had always been called for service, and had served, on freight trains. Tucker and his wife boarded with a Mrs. McGrain, who kept a boarding house at 230 First street, S. E., which was northeast of said opening. On the morning of the accident the regular call boy was off duty, and a machinist's helper was sent by the engine despatcher to call Tucker for passenger train

No. 302, to leave the engine house at 4 A. M.    It was customary in calling for freight train service to have the men sign a duplicate slip or call.    On this occasion, however, no duplicate was sent, because Tucker was wanted for passenger train service. The messenger, according to the testimony of Mrs. McGrain, rang the door bell at her house at about a quarter of 3, whereupon she looked out of the window and saw the boy at the door, who said: "I want Tucker for 3 : 30 ;" that she went out into the hall and called to Tucker, who was on the next or third floor, and when he answered, "Yes, Mrs. McGrain, I am up," she delivered the verbal message to him as requested; that after Tucker had been killed, she found a paper upon which the call for Tucker was written "lying on the floor of the vestibule, where the call boy had slipped it under the vestibule door."    The boy in his testimony admitted that he did not see Tucker, and that he placed the paper containing the call under the door.

The theory of the plaintiff's case was that Tucker assumed, when he was called for 3 : 30, that he was called for freight train service, that being the time the Annex usually left with train crews; that he accordingly proceeded to the opening to take the Annex, which upon that morning was standing almost opposite said opening, and not more than 100 feet therefrom; and that, in attempting to cross said main tracks, he was struck and killed by a passenger train running westwardly from the tunnel on the track nearest the wall.    His remains, according to the testimony of nearly all the witnesses, were found scattered along the track nearer the wall, and between that track and the wall, and, according to all the witnesses, *west* of the opening.    Examination of the passenger engine soon after the accident "showed that it had struck something, and there was blood and stuff on it."    A freight train going in the opposite direction passed on the second track about the same instant the passenger train passed on the first track.    The elements of negligence upon which plaintiff bases her action are that the defendant, having in effect established a way for the use of its employees, was bound to take proper precautions to make said

way reasonably safe; that there were no signalmen, gates, signal lights, or other protective devices at said opening; and further that said passenger train was running at an excessive rate of speed, namely, 30 miles an hour, while, under a municipal regulation in force at that time, it was limited to 12 miles an hour.

*Mr. Frederic D. McKenney, Mr. John S. Flannery,* and *Mr. William Hitz,* for the appellant:

1. Congress did not, by the employers' liability act of 1906, intend to make a common carrier in the District of Columbia responsible to any of its employees for all damages which might result from the negligence of any other employee, whether the employee who was injured or the employee causing the injury was off duty or on duty. Congress did not intend to cover the negligent acts of employees enjoying the privacy of their homes, or walking the public streets, or riding in their own or public conveyances. The act was designed simply to limit the responsibility of the carrier to damages which one servant might cause, and another might sustain, while both were in the actual performance of their respective duties for the carrier. By way of illustration: Suppose a switchman of the defendant company negligently caused the derailment of a street car in which one of the passenger conductors of the defendant was riding in going to or from his work, or in going from his home to the theater, would the defendant be liable under this act? If an employee of the defendant, whose house adjoined the company's right of way, while personally making some repairs to his roof, carelessly dropped a piece of timber over the railway embankment upon the head of a conductor of one of its shifting engines, would the company be liable? If two men in the service of the defendant boarded at the same house, and, in their hurry to respond to a call to report for duty, one of them carelessly injured the other, would the defendant company be responsible under this act? Again, if a surgeon of the defendant in performing an operation upon another employee of the company negligently caused or aggravated an injury, so as to give the

person injured an action against the surgeon for damages, would the company be liable? None of the cases cited by way of illustration are within the powers of Congress, yet the language of the act of 1906 is broad enough to cover all of them. See *Hoxie* v. *New York, N. H. & H. R. Co.* 73 Atl. 754, 760. Tucker had been called, but had not reported for duty, and his wages had not begun to run. At the time he was injured the company had no control over him. He had not delivered himself into its keeping. He was free to change his mind, and return to his home, or go elsewhere about the city. He was at a public place, where he had the same rights and the same obligations as the traveling public, but where he had no greater immunities, and was entitled to no greater protection. He was not in the position of a servant going to his work, and making use of an appliance or way provided by the master for that purpose, which was the only means of access to that work. At the time he was injured, Tucker was free to select his own means of reaching his place of work, whether it was the roundhouse or the Annex, and, having the utmost freedom of action, he chose the most hazardous way of responding to the call for duty, and suffered death in an effort to save himself a short and perfectly safe walk of a square and a half.

That Tucker, at the time of the accident, was not an employee of the defendant company, for whose injury or death an action might be maintained under the employers' liability act of 1906, see *Fletcher* v. *Baltimore & P. R. Co.* 168 U. S. 135. And the principle established by the *Fletcher Case,* that when a servant has quit work for the day he is to be no longer regarded as an employee, is well established in a long line of decisions in the State and Federal courts. See *B. & O. R. R.* v. *Trainor,* 33 Md. 542, 554; *Orman* v. *Salvo* (C. C. A.), 117 Fed. 233.

An employee is not such in the strict sense, after business hours, or when he is not actually employed, if his engagement is intermittent and by the day. See *Fink* v. *Weiler,* 41 Ill. App. 336; *Cincinnati, N. O. & T. P. R. Co.* v. *Conley,* 14 Ky. L. Rep. 568, 20 S. W. 816; *Washburn* v. *Nashville & C. R. Co.* 40 Tenn. 638; *Baker* v. *C. R. I. & P. R. Co.* 95 Iowa, 163;

*McDaniel* v. *Highland Ave. & Belt R. R. Co.* 90·Ala. 64; *State use of Abell* v. *Western Maryland R. Co.* 63 Md. 433; *Savannah, F. & W. R. Co.* v. *Flannagan,* 82 Ga. 579, 14 Am. St. Rep. 183; *Corbin* v. *American Mills,* 27 Conn. 274, 71 Am. Dec. 63.

2. The employers' liability act of 1906, if applicable to the case at bar, is unconstitutional and void. The specific grounds upon which the act is questioned in this case were not argued by counsel, and were apparently not considered in *Hyde* v. *Southern R. Co.* 31 App. D. C. 466, and *El Paso & N. R. Co.* v. *Gutierrez,* 215 U. S. 87, 54 L. ed. 106.

The legislative powers ·of Congress ·over the District of Columbia are exclusive, but not omnipotent. Congress cannot deprive the people of the District of those rights which they, in common with other citizens of the United States, have reserved by their Federal Constitution. Congress may distribute the judicial authority and regulate judicial proceedings in the District of Columbia as it sees fit, but cannot, in either civil or criminal cases, deprive the people of the District of the right to a·trial by a common-law jury, or contravene any other provision of the Constitution. *Hof Case,* 174 U. S. 5. Congress may take private property of the citizens of the District under the right of eminent domain, may erect special tribunals for such purpose differing from the common-law jury, may provide for the estimation and apportionment of the damages and the assessment of benefits to the owner, but it ·cannot authorize such taking without just compensation. *Bauman* v. *Ross,* 167 U. S. 548. While Congress may regulate procedure in criminal cases, it can make no law directing the prosecution of a citizen of·the District for crime, unless after indictment by a grand jury, nor compel an accused to give evidence against himself, or place him twice in jeopardy for the same offense; nor can Congress pass any law abridging the freedom of speech or of the press or the free exercise of religion in the District of Columbia, nor deprive any citizen of the District of his life, liberty, or property without due process of law. *Davidson* v. *New Orleans,* 96 U. S. 101. As was said by the Supreme Court in *Wight* v. *Davidson,* 181 U. S. 371, at page 384, while

Congress can regulate assessments of property in the District of Columbia, has exclusive jurisdiction, and is not controlled by the provisions of the 14th Amendment, "no doubt, in the exercise of such legislative powers, Congress is subject to the provisions of the 5th Amendment to the Constitution of the United States, which provide, among other things, that no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation." For definitions as to what is due process of law, see *Wight* v. *Davidson,* supra, page 387 (dissenting opinion of Harlan, J.); *Davidson* v. *New Orleans,* 96 U. S. 107; *Murray* v. *Hoboken Land Co.* 18 How. 272, 276; Cooley, Const. Law, pp. 230–233.

The act of 1906 does not allow common carriers doing business in the District of Columbia freedom of contract. It does not guarantee to them a fair and impartial trial by jury in a common-law court. On the contrary, it strips them of practically every defense which is open to the master in suits brought by or on behalf of a servant, and takes their property without due process of law.

The contract in this case shows upon its face that it was a voluntary agreement, and nowhere recites that the employer shall be thereby released or exempted from the consequences of its negligence. It provides simply "that the acceptance of benefits from the said relief fund for injury or death shall operate as a release of all claims for damages against said company, arising from such injury or death, which could be made by or through" the employee.

. It is not the kind of a contract usually made by express and similar companies with their employees, which was reviewed and sustained by the Supreme Court in the case of *Baltimore & O. R. Co.* v. *Voigt,* 176 U. S. 498. It had no reference whatever to commerce or transportation, and in no way deprived the employee or beneficiary of freedom of action.

Liberty of contract is one of the inalienable rights expressly reserved in the 5th and 14th Amendments. *Allgeyer* v. *Louisiana,* 165 U. S. 578. See also *Adair* v. *U. S.* 208 U. S. 161.

Is it due process of law to give to a corporation or individual engaged in a private or quasi-public enterprise the right to contract freely with its employees, and, in the event of injury to them, to allow the employer to invoke all of the defenses which are open to masters generally, and, if the accident results in death, restrict the liability for damages to a maximum amount of $10,000 (D. C. Code, sec. 1301); but, if the corporation has the misfortune to be a common carrier, to strip it of all of the defenses open to other employers, and subject it to any penalty which the caprice of the jury or the harshness of the court may impose?

Again, is there any reason why the laborers employed and paid by common carriers should be more favored when their own accidents occasion injuries and death to themselves and others, than the helpless passengers who are the victims of their carelessness, and who have paid for their transportation? This act practically makes the carrier an insurer of the safety of its servants, by depriving it of the power to limit its liability by contract, abolishing the doctrine of fellow servants and contributory negligence, and introducing the doctrine of comparative negligence, which is novel in this jurisdiction. A passenger must establish negligence in order to recover, and the amount of his recovery may be limited or reasonably restricted in the contract of transportation. In the case of injury his contributory negligence may be a bar, and if killed the amount of recovery for his death is limited to $10,000, and even that amount cannot be recovered unless the beneficiaries can prove that they have suffered pecuniary loss to that extent. But in the case of the servant of a railroad company, arising under this act, the master is practically helpless. The contributory negligence of the employee, no matter how gross, will not bar his right of recovery. No contract will be valid which attempts to limit the responsibility of the carrier. And in the case of death resulting to the employee, the amount of recovery by his beneficiaries is unlimited, and is not confined to pecuniary loss, but the greatest latitude is given for the assessment of damages, punitive and otherwise.

It cannot be denied that under the 14th Amendment, which, of course, applies to the States, and not to this District, such legislation would be a denial of the equal protection of the laws. But is it not likewise a denial of due process of law under the 5th Amendment? See *Chicago R. Co.* v. *Chicago,* 166 U. S. 226, 234.

By this act of 1906 it is true the carrier is given a court in which to try the issues arising between itself and its employees, but it is a court in which there is more form than substance; a forum in which the employer is practically defenseless under the law; where the trial justice is fettered, and the jury are supreme.

The act of 1906, in so far as the District of Columbia is concerned, is not an act regulating interstate commerce, but a statute defining the rights of master and servant. Under the commerce clause of the Constitution, Congress has been held to have the power to place common carriers in a class by themselves, and to make laws increasing their responsibilities and restricting their defenses in cases growing out of the extra-hazardous business of railroad operation. This act, however, embraces all persons who are employed by carriers in the District of Columbia, and the nature of the service in which they are engaged is not the test. The employer may be carrying on a work having but a remote relation to interstate commerce, or which is in no sense extra-hazardous. The intention of Congress to legislate separately on this subject for the States and for the District of Columbia is made manifest by an examination of the provisions of the employers' liability act of 1908, which separates into distinct paragraphs carriers engaged in interstate commerce from those engaged in business in the District of Columbia. The first paragraph of that act begins: "Every common carrier by railroad while engaging in commerce between any of the several States or Territories * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." The second paragraph of the act provides: "That every common carrier by railroad in the Territories, the District of Columbia, etc.,

\* \* \* shall be liable in damages to any person suffering injury while he is employed by such carrier in any of such jurisdictions."

While conceding the exclusive power of legislation that Congress possesses over the District of Columbia, we contend that when Congress passes a law for this District which does not attempt to regulate commerce between the District and the States, but seeks to change the established law of the District of Columbia governing the relation of master and servant generally, that law must be uniform, and operate upon all masters engaged in business in the District of Columbia alike, and that Congress cannot segregate one class of masters, to wit, common carriers, and impose upon them legal obligations and pecuniary responsibilities from which other employers of men are exempt, or deny to them rights, remedies, or immunities which are given to others. *Holden* v. *James,* 11 Mass. 404; *District of Columbia* v. *Brooke,* 214 U. S. 149; *Jaquette* v. *Capital Traction Co.* 34 App. D. C. 41.

3. The use made of the opening did not make it a "way" under the act of 1906.

The act plainly refers only to ways and works established and maintained by the carrier,—the language used being "its" ways or works,—and not the ways which might be established by others, whether employees or third parties, of which the carrier might or might not have knowledge.

At the time and place in question, Tucker was not an employee traversing or attempting to make use of a way provided by the company, which it was the duty of the latter to render safe, but he was a mere licensee, to whom the defendant owed no duty except to refrain from inflicting wanton and wilful injury after discovering him in a position of peril. 23 Am. & Eng. Enc. Law, 2d ed. p. 736, and cases cited; *B. & O. R. R. Co.* v. *Allison,* 62 Md. 479; *Illinois C. R. Co.* v. *Godfrey,* 71 Ill. 500, 22 Am. Rep. 112; *Morrissey* v. *Eastern R. R. Co.* 126 Mass. 377; *Chesapeake Beach R. Co.* v. *Donahue,* 107 Md. 119.

He was not in the more favored position of the plaintiffs in

the *Golway Case,* 6 App. D. C. 143, and the *Glaria Case,* 30 App. D. C. 559, where there was evidence tending to show an established pathway across the defendant's tracks, of which the officials of the railroad company had knowledge, and which the plaintiffs were using at the time of the accidents.

The trial court, by disregarding the only positive testimony as to the speed of the engine which struck the decedent in passing the opening, and submitting the case to the jury to find whether the defendant had exceeded the maximum of 12 miles an hour upon evidence showing the average speed between the two stations referred to to have been 1.2 miles in two minutes, permitted the jury to disregard the evidential facts, and to find the defendant negligent in this regard, upon nothing more substantial than an inference. In doing so, the trial justice violated a well-established rule of the Supreme Court and of this court, that inferences cannot be drawn from inferences or be based upon facts which themselves have been presumed. *Weaver* v. *B. & O. R. R. Co.* 3 App. D. C. 436; *Manning* v. *Insurance Co.* 100 U. S. 693.

While the act of 1906 requires that all questions of negligence and contributory negligence shall be for the jury, if there was no evidence of the defendant's negligence legally sufficient to take the case to the jury, there was no room for the application of the doctrine of comparative negligence under the act of 1906, and no justification for the oral charge of the court to the jury to weigh the negligence of the decedent, and the defendant, and to return a verdict for the plaintiff, if they found the negligence of the defendant to be gross, and that of the decedent to be slight in comparison.

4. Although the act of 1906 abolishes the fellow-servant rule, introduces the doctrine of comparative negligence, and requires all questions of negligence and contributory negligence to be submitted to the jury for determination, it does not, either expressly or by implication, abrogate or abridge the well-established doctrine of assumption of risk. This latter doctrine embraces not only injuries which may be occasioned to an employee by one of his fellow workmen, but also injuries arising from the

inherently dangerous character of the work, for example, the sudden breaking of machinery which has stood the test of inspection, or the falling of a scaffold by the sudden breaking of its supports, after the master had made reasonable efforts to select good material and properly construct it, or the explosion of a gas tank or holder as a result of the explosive nature of the product, and not as a result of any negligence of the master.

That Congress recognized the well-understood distinction between assumption of risk and contributory negligence is apparent from a comparison of the provisions of the employers' liability acts of 1906 and 1908. No reference is made to the doctrine of assumption of risk in the act of 1906, but in the latter statute a separate paragraph (the fourth) is devoted to assumption of risk; and it is there stated that the employee shall not be held to have assumed the risk of his employment in any case where the employer has violated a statute enacted for the safety of the employee,—thereby inferentially declaring that in all cases where the employer has not violated any such statute, and the accident resulted from one of the assumed risks, the employer would not be responsible. "A master is not liable to a servant for injuries received from any ordinary risk incident to the character of the services contemplated by the hiring, because these are assumed by the servant as impliedly a part of his contract. Among these ordinary risks the courts have, by judicial reasoning in modern times, included the risk of injuries caused by fellow servants in the same line of employment." Andrews, Am. Law, p. 874.

The doctrine of assumed risks is entirely independent of the principles of law governing the relation of master and servant. It requires no contractual relation to support it, but is founded upon the maxim *Volenti non fit injuria,* and is applied in all cases where the injured person, whether a servant or a stranger, notwithstanding his knowledge of the possibilities of danger, voluntarily undertakes or continues in an employment, and suffers injury in the course thereof. 1 Labatt, Mast. & S. secs. 368 et seq.; Andrews Am. Law, pp. 879–880; *Butler* v. *Frazee,* 25 App. D. C. 392.

In this case the evidence clearly showed that the decedent, Tucker, voluntarily selected the most dangerous way of going either to the Annex or to the roundhouse.

5. Although the act of 1906 makes many important changes in the substantive law governing the relations of master and servant, it nowhere attempts to change the established rules of evidence by which actions for damages growing out of such relations are to be tried.   One of the strictest of these rules is that no presumption of negligence arises from the fact of accident, as in the case of a passenger, but the servant must prove every material allegation of his declaration, and if he fails to do so, or his proof leaves the matter in doubt, he cannot recover damages of the master.   See *Patton* v. *Texas & P. R. Co.* 179 U. S. 658–663; *Butler* v. *Frazee,* 25 App. D. C. 392, 402.

6. The trial justice, without the slightest evidence as to the age of the widow, the health of either the widow or child, or their probable duration of life, permitted the jury to speculate as to all of these important particulars, in order to arrive at a basis for the estimation of damages.   This was erroneous. *Baltimore & R. Tnp.* v. *State,* 71 Md. 573, 582.

This court in the case of *United States Electric Lighting Co.* v. *Sullivan,* 22 App. D. C. 115, 138, held that evidence "tending to show the age, feeble health, burdens, and poverty of the father of deceased"—the beneficiary in that case—was rightly admitted as affording some aid to the jury in determining the amount of the damages sustained.   See also *The Dauntless,* 121 Fed. 420, 423.

*Mr. Alvin S. Newmyer* and *Mr. Levi H. David,* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

In the brief of appellant, which is one of unusual merit, the constitutionality of the employers' liability act of June 11th, 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148). is challenged.   This act has been twice consid-

ered by the Supreme Court of the United States. In the *Employers' Liability Cases* (*Howard* v. *Illinois C. R. Co.*) 207 U. S. 463, 52 L. ed. 297, 28 Sup. Ct. Rep. 141, which embraced a series of cases, and which were elaborately presented by able and astute counsel, the court declared the act unconstitutional in so far as it related to carriers engaged in business in the states. Subsequently, in *El Paso & N. E. R. Co.* v. *Gutierrez,* decided Nov. 15th, 1909, 215 U. S. 87, 54 L. ed. 106, 30 Sup. Ct. Rep. 21, the constitutionality of the act as applied to the District of Columbia and the territories was brought under review. The court, in a unanimous opinion, reached the conclusion "that in the aspect of the act now under consideration the Congress proceeded within its constitutional power." This court, in *Hyde* v. *Southern R. Co.* 31 App. D. C. 466, carefully considered the act as applicable to the District of Columbia, the decision in *El Paso & N. E. R. Co.* v. *Gutierrez* then not having been rendered, and pronounced the act constitutional in so far as it applies to this District and the territories. An examination of the points advanced by counsel, as disclosed by the report of the case, shows that most, if not all, the questions raised by counsel in this case were brought to the attention of the court in the *Employers' Liability Cases.* But even if this were not the fact, we would hesitate to declare a law unconstitutional that had been twice before the court of last resort, and, so far as it applies to this District, had been declared to be constitutional. In such a situation we must assume that the Supreme Court, before declaring the act constitutional, considered it in all its phases. Certainly it would not be becoming in a court of inferior jurisdiction to attempt to demonstrate to the higher tribunal the incorrectness of its conclusion in a given case. Such being the situation, we shall dispense with a useless task, and pass over without comment this assignment of error.

2. It is specified as error that the court refused to hold "that the plaintiff's intestate at the time of the accident was not on duty, was not in the actual service of the defendant, and was not an employee within the contemplation of the employers'

liability act of 1906, and that said act was inapplicable to the case at bar."

It is conceded by defendant that, had Tucker reached the Annex, assuming that he had been called for freight train service, he would have been in the employ of the defendant company within the meaning of sec. 1 of said act of 1906, notwithstanding that technically his term of service would not have commenced until he had reached the freight yards to which the Annex was to carry him. This concession is made upon the theory that he would then have been upon a conveyance provided by the master, and hence under the master's control. There are numerous cases sustaining this view. It is contended, however, that, until Tucker did reach the Annex, he was not a servant of the company within the contemplation of the act. When Tucker was killed he was upon the premises of the defendant, in response to its call, to assume the duties he had been engaged by the defendant to assume, and for their mutual interest and advantage. Can it be that under such circumstances the relation which the decedent sustained to the defendant was that of a mere stranger? Is it possible that the act under consideration warrants a distinction so fine as to permit a master to escape liability for negligence resulting in the injury of one hired to perform service, because the injury occurs before the service is actually undertaken, notwithstanding that, at the time of the injury, the servant is properly and necessarily upon the premises of the master for the sole purpose of his employment? We think not. Such a rule, in our view, would be as technical and artificial as it would be unjust. We think the better rule, the one founded in reason and supported by authority, is that the relation of master and servant, in so far as the obligation of the master to protect his servant is concerned, commences when the servant, in pursuance of his contract with the master, is rightfully and necessarily upon the premises of the master. The servant in such a situation is not a mere trespasser nor a mere licensee. He is there because of his employment, and we see no reason why the master does not then owe him as much protection as it does the moment he enters

upon the actual performance of his task.   In the present case, assuming for the moment the existence of a way through said opening, and across the two main tracks adjacent thereto, we can see no reason for a distinction between the master's obligation to Tucker while he was traveling over that way, and its obligation to him after he had entered the Annex, which was only another agency provided by the master for the accommodation of its servants.

In *Northwestern Union Packet Co.* v. *McCue,* 17 Wall. 508, 21 L. ed. 705, a bystander was hired on a wharf to assist in loading a boat which was soon to sail.   This man had been occasionally employed in such work.   His service occupied about two and one-half hours, when he was directed to go to the office, which was on the boat, and get his pay.   This he did, and then attempted to go ashore.   While on the gang plank the plank was recklessly pulled from under his feet, and he was thrown against the dock, receiving injuries from which he died.   Owing to the somewhat peculiar nature of the case, it was held that it was for the jury to say, although the facts were undisputed, whether the relationship of master and servant existed until the man got completely ashore.   The concluding sentence of the opinion by Mr. Justice Davis was as follows: "The defense at best was a narrow one, and in our view more technical than just."

In *Ewald* v. *Chicago & N. W. R. Co.* 70 Wis. 420, 36 N. W. 12, 591, it was held that an engine wiper employed in the defendant's roundhouse, while going to his work along a pathway crossing the defendant's yard and tracks, was an employee of the defendant, hence could not recover for injury resulting from the negligence of a fellow servant on the freight train causing the injury.   The court in its opinion said: "The peculiar facts of this case which make him such appear to involve precisely the same principle as that class of cases where the plaintiff was being carried on his way from and to his place of labor by the railroad company, by consent, custom, or contract, and was injured by the negligence of other employees of the company.   This carriage of the plaintiff was the means, facil-

ity, and advantage to which he was entitled by reason of his being an employee or servant, which entered into and became a part of his contract of employment, or were incidental and necessary to it   *   *   *   again it may be said that the plaintiff was still an employee because he was attempting to use the pathway between the cars as the only customary and convenient means of access to and exit from the roundhouse, which the company had provided and was under obligation to keep open and safe for him and his fellow workment, when he was injured."

In *Boldt* v. *New York C. R. Co.* 18 N. Y. 432, plaintiff was injured while walking on a new track from his house to his work.   The court said: "But he was in the defendant's employment, and doing that which was essential to enabling him to discharge his particular duty, *viz.,* going to the spot where it was to be performed, and he was, moreover, going on the track where, except as the servant of the company, he had no right to be.   He was there as the employee of the company, and because he was such an employee."

But it is urged that *Fletcher* v. *Baltimore & P. R. Co.* 168 U. S. 135, 42 L. ed. 411, 18 Sup. Ct. Rep. 35, sustains the view of the defendant on this question.   We do not so read that case.   There the plaintiff at the time of the accident had ended his work for the day, "and had left the workshop and grounds of the defendant, and was moving along a public highway in the city with the same rights as any other citizen would have," when he was struck by the rebounding of a stick of timber thrown from a train of the defendant by one of its employees, a practice permitted by the company, and injured. It was held that "the liability of the defendant to the plaintiff for the act in question is not be gaged by the law applicable to fellow servants, where the negligence of one fellow servant by which another is injured imposes no liability upon the common employer."   Manifestly that case and this are materially different.   There the plaintiff was not on the premises of the defendant, but upon a public highway, where his relations to the defendant were precisely those of the general

public to it. Its relation to him, therefore, in such a situation, was precisely what it would have been to any other pedestrian. Here, however, the plaintiff was upon the premises of the defendant, upon its invitation, in the line of his employment, and solely because of such employment. We hold, therefore, that, at the time of his death, Tucker was within the protection of said act.

3. Did the court err in refusing to hold that the defendant company, as a matter of law, was not guilty of negligence? Under this assignment it is urged that the act under consideration "refers only to ways and works established and maintained by the carrier,—the language used being '*its*' ways and works,— and not the ways which might be established by others, whether employees or third parties, of which the carrier might or might not have knowledge," and hence that the court erred in refusing to instruct the jury as in effect requested by the defendant, that there was no duty imposed by any law in force at the time of the accident, requiring the defendant to maintain watchmen, gates, signals, or other appliances, to indicate the approach of engines and trains upon its tracks at or near said opening.

Sec. 1 of said act (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148), provides "that every common carrier engaged in trade or commerce in the District of Columbia * * * shall be liable to any of its employees, * * * for all damages which may result from the negligence of any of its officers, agents, or employees, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, ways, or works."

Was this a *way* within the meaning of the act? The uncontradicted testimony shows, as previously stated, that, for two years prior to this accident, employees of the defendant daily used this opening in going to 'and returning from their work. The policeman on that beat testified that "they came through there a dozen in a string, straggling along like men coming from work." Another witness, an extra brakeman of the defendant, testified "that he had seen railroad men on lots of occasions go through the opening, prior to Tucker's death." A switchman

of the defendant, employed at said ND tower, where, of course, he would usually have an unobstructed view of said opening, testified "that he had quite often seen employees of the company use that opening as a crossing place to go to the Annex, or to go to or come from their work." Another railroad man testified that, from December, 1906, to March, 1907, his employment was such that "he saw defendant's employees every morning and every evening make use of the opening in the wall as a crossing place." Several other witnesses testified to the same effect. The testimony further showed that there was a path through Garfield park on the north leading to this opening, and, as previously pointed out, that the Annex would usually stop at a point about opposite the opening to receive the men coming therethrough.

This opening was upon the premises of the defendant, and, of course, under its control. Had the defendant desired to prevent the use of this opening and the tracks adjacent thereto as a means of access to and exit from its Annex, yard, and roundhouse, it might easily have done so; but no precautions whatever were taken to prevent such use. The long-continued practice fully justified the inference that this was with the knowledge and consent of the defendant. *Baltimore & P. R. Co.* v. *Golway,* 6 App. D. C. 143; *Glaria* v. *Washington Southern R. Co.* 30 App. D. C. 559.

It is, we think, clear that, had the defendant provided a way for pedestrians through this opening and across the tracks adjacent thereto, by putting ordinary planking between the rails and possibly between the opening and the tracks, and had then notified its employees that such way was for their convenience, such a way would have been within the protection of the act. The word "ways" was placed in the act for some purpose, and if it does not embrace a path provided by the master on its premises for the use of the master's servants, we fail to appreciate its function. If the master, therefore, may establish such a way by positive action, why should it be relieved of responsibility if it permits the establishment of a like way by others?

In either case, we think, the way is *its* way within the meaning of said act.

The learned trial justice, in his charge to the jury on this phase of the case, said: "The theory of the plaintiff's case is that the railroad company was at fault in providing him a way of approach to his work over its tracks, which was insufficient or defective, in that it was not properly guarded, and also in that it ran its train at an improper rate of speed over this way, where he was expected to pass.

The first point I will direct your attention to is this point in regard to the way itself. The theory of the plaintiff's case is that the railroad company had permitted the men to come in through this opening, and go to this train called the Annex, so regularly, for such a long period of time, at all hours of the day and night, that it had become an established way for the men to use, as much so as if there had been a regular beaten path there, or something to indicate that that was the crossing. The theory of the plaintiff's case is that the railroad company had so treated it, knowing that the men were using it, making no objection to it whatever, putting up no warnings, and never intimating to them that it was not to be so used; that it had thereby become, by the conduct and treatment of the defendant, a regular way of approach which the men, as reasonable men, in the service of the company, had a right to understand they were to use, because it was so much quicker than the safer way around.

"So   *   *   *   it is urged that they ought to have had some watchman there, if they were to establish it as a way, or some guard of some sort, or some signal; so that when the men were crossing to come to the Annex, they would be warned that the train was about to pass over the tracks."

Sec. 1 of the act visits upon the carrier or master responsibility for damage resulting "from the negligence of any of its officers, agents, or employees, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways, or works." What is the significance and meaning of the word "insufficient" as above

used? The word as defined in the Century Dictionary means "lack of sufficiency; deficiency in amount, force, or fitness; inadequateness; incompetency; as *insufficiency* of supplies; *insufficiency* of motive." The adjective "insufficient," as defined by the same authority, means "not sufficient; lacking in what is necessary or required; deficient in amount, force, or fitness; inadequate; incompetent." A failure of a common carrier to provide proper and adequate brakes on its engines and cars would would be an insufficiency of equipment, within the meaning of the act. Can it be said that this way, which, as we have seen, had become established for the use of the servants of the defendant in going to and from their work, was an adequate and fit way? Is it not apparent that it was lacking in what was necessary or required, in that no protection whatever was provided against accidents that such a situation was liable to result in? Congress in this act was evidently attempting to require common carriers to take proper precautions to protect their servants. Why, then, should the carrier be absolved from responsibility for neglecting to provide a way for its employees properly safeguarded, and therefore adequate and sufficient? It seems to us that such a situation is within the spirit and purpose of the act, and equally within the letter thereof. We conclude, therefore, that the question of the sufficiency of this way was properly submitted to the jury.

4. Did the court err in permitting the jury to compare the negligence of the decedent with the negligence of the defendant, and to render a verdict in favor of the plaintiff if they found the negligence of the decedent slight and that of the defendant gross? Section 2 of the act in terms provides that this shall be done, but further provides for the diminution of damages in proportion to the amount of negligence attributable to the employee. The court's charge to the jury was in strict compliance with these provisions of the law.*

---

*The portion of the trial court's charge relating to the comparative negligence of the parties was as follows: If you find that it was negligence on his part, and contributory negligence as I have just defined it, then

5. In this assignment it is sought to interpose as a defense to the action the doctrine of assumption of risk. While the act does not in terms refer to this doctrine, it does provide in sec. 3 "that no contract of employment   *   *   *   shall constitute any bar or defense to an action brought to recover damages for personal injuries to or death of such employee." The doctrine of assumption of risk results from the contractual relations of the parties. In the absence of any statute regulating the matter, the law implies that the contract of employment contemplates that the servant assumes certain risks. It is argued that Congress did not intend to change this rule, and hence that Tucker assumed the risks incident to the use of said way as a means of going to his work.

In this connection it is argued that Tucker voluntarily selected the more dangerous way when he might have proceeded

---

that does prevent the plaintiff recovering in this action, unless you find another fact; that is, unless, when you compare that negligence of the decedent with this negligence of the defendant, you say that the defendant's negligence was gross, and in comparison with it the decedent's negligence was slight.

. Suppose you say that the defendant company was negligent; that you are thoroughly satisfied of that by the balance of the testimony; that you are also satisfied that the decedent was negligent, guilty of contributory negligence. Now, compare the two. Were they about alike? Was one about as careless as the other? Then there can be no recovery, because the act itself provides that the plaintiff may recover provided the decedent's contributory negligence was slight in comparison with that of the defendant; that is, that the defendant's was gross, and, in comparison with it, the decedent's negligence was only slight.

If, upon all the evidence, you say that you find, by a fair balance of the testimony, that the defendant was thus guilty of negligence, that that was the cause of the decedent's death in the way described in the declaration, and that even though the decedent was guilty of negligence on his part that contributed to his injury and death, it was slight in comparison with the gross negligence of the defendant, then the plaintiff would be entitled to recover; but you would be bound, under the terms of the act, to reduce the plaintiff's recovery in proportion to his negligence. The plaintiff would be required to bear his proportion of .the damages indicated by the decedent's negligence.—REPORTER.

down Virginia avenue to South Capitol street, where he could have gone under the tracks, and thence back to the Annex. Had he chosen that way, it would have required him to go 1,100 feet further, and, moreover, the testimony shows beyond dispute that the way he did choose was the customary and usual way for employees living in his locality. Moreover, the act ordains that "all questions of negligence and contributory negligence shall be for the jury."

In 1897 an employers' liability act was passed in North Carolina. Sec. 2 of that act provides "that any contract or agreement expressed or implied, made by an employee of said company to waive the benefit of the aforesaid section, shall be null and void." Thereafter suit was brought by a railroad employee who was injured by reason of a patent defect in an engine, and the defense was that, inasmuch as he had continued to use this engine for some time after this defect was known to him, he assumed the risk of accident resulting from said defect. The court, however, ruled otherwise. The court said (*Coley* v. *North Carolina R. Co.* 128 N. C. 534–538, 57 L.R.A. 817, 39 S. E. 43) : "It is agreed that assumption of risk is contractual, either by express terms or by implication; and disputes usually were as to whether the plaintiff contracted by implication or assumption for dangers not existing at the date of employment. And it would seem by this act that the legislature intended to put an end to such contentions, by saying in the 1st section that he shall have a right of action for injuries caused by such defective machinery, and by providing in the 2d section that he cannot waive this right by contract expressed or implied." The court in this opinion also called attention to the English case of *Smith* v. *Baker* [1891] A. C. 325, in which was considered the English employers' act of 1880, which provides that an employee shall not maintain an action against his master for injuries received from defective machinery, ways, etc., unless he gives notice of such defects to the master or some superior, unless the master already knows of the defects. A majority of the lords who rested their opinions upon the act agreed that it did away with implied assumption of risk.

In *O'Malley* v. *South Boston Gaslight Co.* 158 Mass. 135, 47 L.R.A. 161, 32 N. E. 1119, the court held that the statute of that state did not strike down the doctrine of assumption of risk, because "the statute does not attempt to take away the right of the parties to make such contracts as they choose, which will establish their respective rights and duties." See also *Davis Coal Co.* v. *Polland,* 158 Ind. 607, 92 Am. St. Rep. 319, 62 N. E. 492; *Narramore* v. *Cleveland, C. C. & St. L. R. Co.* 48 L.R.A. 68, 37 C. C. A. 499, 96 Fed. 298; *Kelley* v. *Great Northern R. Co.* 152 Fed. 211.

In interpreting this act we should bear in mind "the purpose of Congress to regulate the liability of employer to employee, and its evident intention to change certain rules of the common law which theretofore prevailed, as to the responsibility for negligence in the conduct of the business of transportation." *El Paso & N. E. R. Co.* v. *Gutierrez,* decided by the Supreme Court of the United States November 15th, 1909, 215 U. S. 87, 54 L. ed. 106, 30 Sup. Ct. Rep. 217. Having that purpose in mind courts ought not to place such a construction upon the act, unless compelled by its terms so to do, as will in a large measure defeat such purpose. There are comparatively few employees of common carriers who would sacrifice their positions because of known defects. We think this act was intended to quicken the responsibility of carriers, and, by doing away with the doctrine of assumption of risk in cases based upon their negligence, compel them to take proper precautions for the safety of their servants. In other words, the act was meant to discourage negligence. It is an easy thing to say that no one is compelled to remain in the service of the carrier, but experience demonstrates that this is only half a truth. It is the policy of the law to protect so far as possible, those pursuing, and oftentimes necessarily pursuing, so hazardous an employment. It is enough that they must assume the intrinsic risks of their calling without compelling them to assume the negligence of their employers.

Our attention is directed to the difference in the phraseology of the employers' liability act of April 22d, 1908 (35 Stat. at

L. 65, chap. 149, U. S. Comp. Stat. Supp. 1909, p. 1171), as bearing upon the question under consideration. That act excuses employees from the rule of contributory negligence in any case where a failure by the carrier to comply with any statute enacted for the safety of employees contributed to the injury complained of. The act then provides that the doctrine of assumption of risk shall not be applicable to such a situation. We see no reason why that act should be interpreted as a legislative declaration that the prior act of 1906 did not do away with the doctrine of assumption of risk, in so far at least as the injury forming the basis of the action resulted from the negligence of the carrier. There was special reason in the later act for inserting a provision in respect of the doctrine. Moreover, it well might be held that, since the first section of the later act in terms charges the master with responsibility for any defect or insufficiency due to its negligence in its cars, engines, appliances, etc., such a statute was "enacted for the safety of employees," and hence that the failure of the carrier to keep its cars, engines, appliances, etc., sufficiently free from defects would prevent such carrier not only from interposing the defense of assumption of risk, but also from interposing the defense of contributory negligence. In other words, would the carrier, after admitting its negligence in failing to install and maintain proper and sufficient cars, engines, appliances, etc., and the injury resulting therefrom, be permitted to escape responsibility by resorting to the defense of assumption of risk? Clearly had sec. 1 in terms provided that carriers should install and maintain proper and sufficient cars, etc., and that the failure to do so would render it liable for accidents resulting from such failure, and deprive it of the defense of contributory negligence, the carrier would not be permitted to defeat the law by resorting to the doctrine of assumption of risk. *Kilpatrick* v. *Grand Trunk R. Co.* 74 Vt. 288, 93 Am. St. Rep. 887, 52 Atl. 531. We are not called upon, however, to interpret the act of 1908, and have alluded to it for the sole purpose of ascertaining, if possible, whether it sheds any light upon the meaning of the prior act. We are not prepared to say that there is

anything in the later act which compels a different view than we have taken of the earlier one. Having in mind, therefore, the scope and purpose of the act of 1906, we rule that the trial court was right in refusing the defendant's instruction upon the subject of the assumption of risk.

6. The defendant requested the court to charge the jury as follows: "The burden of proof is upon the plaintiff to establish, by a fair preponderance of the evidence, that the accident occurred in the manner alleged and described in her declaration, and if the jury shall be unable to determine definitely from the evidence that the decedent, Sidney R. Tucker, was struck by the engine of a train on the southbound track coming from the tunnel, as alleged in the plaintiff's declaration, their verdict must be for the defendant." The court on this point instructed the jury that "the question has been made here as to whether the declaration has been proved in respect to the allegation therein that the decedent was struck by the locomotive of the defendant company. It is necessary that you should find that by a fair balance of the testimony. If you cannot find it, the plaintiff has failed to make out her case. It is a pure question of fact for you to decide. I have nothing to do with it." This was a substantial compliance with the defendant's request. There was ample evidence for the jury on this point, which, however, we do not deem it necessary to review.

7. As to the instruction of the court in respect to the assessment of damages: It is not disputed that the evidence as to the age, health, earning capacity, etc., of the decedent, was amply sufficient. It was in evidence that the widow was wholly dependent upon him for support. It was also in evidence that the child was born shortly after the death of the decedent. The widow appeared as a witness before the jury, but there was no direct evidence as to her age or health, or evidence as to the health of the child. Neither was there any evidence as to their probable duration of life. It is insisted that the assessment of damages was therefore mere guesswork. We do not think so. The jury was fully advised as to the decedent, who, when he was killed, was only twenty-four years of age. The

jury saw the widow, and, as intelligent men, could judge as to her age and health. While annuity or life tables are admissible in evidence, they are not controlling. *Vicksburg & M. R. Co.* v. *Putnam,* 118 U. S. 545, 30 L. ed. 257, 7 Sup. Ct. Rep. 1; *Boswell* v. *Barnhart,* 96 Ga. 521, 23 S. E. 414; Sutherland, Damages, § 1265. It is not claimed that the damages assessed were excessive, and indeed it could not well be, when it is considered that the plaintiff must have been a comparatively young woman, and that the child was a babe in arms. In *Grogan* v. *Broadway Foundry Co.* 87 Mo. 321, it was held that the jury may find the amount of damages from proof of the age of the deceased, and the circumstances and condition in life of the plaintiff. In *Southern P. Co.* v. *Lafferty,* 6 C. C. A. 474, 15 U. S. App. 193, 57 Fed. 537, the testimony showed the age of the decedent at the time of his death, the condition of his health, the amount of his earnings, and the extent of his contributions to his mother, in whose behalf the suit was brought. The court held this testimony sufficient on the question of damages. See also *Illinois C. R. Co.* v. *Barron,* 5 Wall. 90, 18 L. ed. 591.

Finding no error in the record, we affirm the judgment, with costs.                                              *Affirmed.*

On application of the appellant, a writ of error to the Supreme Court of the United States was allowed, April 15, 1910.