# Krumbhaar, Appellant *v.* Griffiths.

*Master's finding of facts—Fraud—Vendor and purchaser.*

A master's finding of fact that the secretary of a corporation, who had bought from the complainant a number of shares of stock of the corporation, had no knowledge at the time of the purchase, of any movement which would tend to increase the value of the stock, and had not been guilty of any misrepresentation or fraudulent concealment, will not be reversed except for manifest error.

*Officer of corporation—Confidential relation.*

It seems that there is no special, confidential or fiduciary relation between an officer of a corporation and a person from whom such officer purchases the stock of the corporation.

Argued Jan. 22, 1892. Appeal, No. 155, July. T., 1891, by plaintiff, George D. Krumbhaar, from decree of C. P. No. 1, Phila. Co., March T., 1890, No. 651, dismissing bill in equity against E. B. Griffiths and the Pennsylvania Warehousing & Safe Deposit Co. Before STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Bill in equity to cancel and set aside the sale of shares of the common stock of the Pennsylvania Warehousing & Safe Deposit Co.

The case was referred to Francis E. Brewster, as master, from whose report the following facts appear :

The Pennsylvania Warehousing & Safe Deposit Co. owned certain piers and warehouses on the Delaware river in the city of Philadelphia. In February, 1890, the company was financially embarrassed, and its property was out of repair. An offer was made to the Philadelphia & Reading R. R. Co., to lease the piers of the warehousing company, but the railroad company declined. Subsequently the railroad company offered as an experiment to rent one of the piers for the term of one year, at an annual rental, of $10,000. The railroad company was to have the right to demand from the warehousing company a lease of all their other piers for a term of not less than ten nor more than one hundred years, at an annual rental of $6,000 for each pier. The warehousing company were also to endeavor to acquire certain intermediate properties which were also to be leased to the railroad company. After some opposition this proposition was accepted both by the directors and stockholders of the warehousing company, and the lease of pier No. 38 was executed by the railroad company on Feb. 1, 1890, and was confirmed at a stockholder's meeting. On Feb. 3, 1890, the lease was executed by the officers of the warehousing company. On Feb. 17, 1890, the railroad company exercised its option to take the other piers of the company.

About Feb. 1, 1890, the market price of the common stock of the warehousing company was $42.50 per share. In March, when the exercise of its option by the railroad company became public, the stock rose to $125 per share.

Defendant was elected secretary of the warehousing company on Feb. 3, 1890. For a few months prior to that time he had been acting secretary, and for several years prior thereto he had been employed as clerk or bookkeeper by the company. A few months before the transaction in controversy the president had urged upon the minor officials of the company the advisability of their holding a small stock interest in the company. Defendant had accordingly, in January, 1890, purchased fifteen shares of the common stock.

In February, 1890, and for a long time prior thereto, plaintiff was the owner of twenty-five shares of the warehousing company's common stock. Early in February plaintiff re-

ceived a note from a broker offering to sell his stock for him. Accordingly on Feb. 8, 1890, he called at the office of the warehousing company for the purpose of making inquiry as to its financial condition. He there saw defendant, the recently elected secretary of the company, and had an interview with him, at which he asked defendant what the condition of the company was, and what its earnings had been. Defendant thereupon showed him the annual report which had been made to the stockholders at their meeting held in Feb. 3, 1890, and explained it to plaintiff. At this interview plaintiff stated that he had received an offer for the sale of the stock. On Feb. 11, 1890, defendant wrote plaintiff telling him that he could find a purchaser for his stock. In answer to this communication, plaintiff, on Feb. 12, 1890, called again at the office of the company and saw defendant, who offered him $50 per share for his stock. Plaintiff refused to sell at that price, but wanted $60, finally, however, offering to sell for $55. Defendant was unwilling to pay that much, and the interview terminated in plaintiff's giving defendant an option to buy his stock at $55 per share. On the same day defendant exercised his option and agreed to take plaintiff's stock, and, on the following day, the sale was consummated.

Plaintiff alleged in paragraph 4 of the bill, and before the master contended that at their interviews he several times asked defendant whether there was anything pending or any movement in prospect likely to increase the value of the stock of the company, and that defendant replied that there was not, which reply was untrue and known by defendant to be untrue. Defendant denied in his answer that any such inquiries were made by the plaintiff, or that he replied untruthfully as charged in the bill. Having been called by plaintiff as for cross-examination, defendant testified emphatically that at the time of these interviews and when he bought the plaintiff's stock, he had no knowledge whatever of anything pending in the affairs of the company, nor of any movement in prospect likely to increase the value of its stock.

The master found as a fact that [at the time defendant bought plaintiff's stock he did not know of anything that was pending or of any movement in contemplation likely to cause a rise in the value of the stock, and, of course, he had no knowl-

edge to impart to plaintiff which he unfairly or improperly concealed.] (3)   The master also found as a matter of law that [there was no special, confidential or fiduciary relation between complainant and defendant,] (12) citing, among other cases: McElheny v. Oil Co., 61 Pa. 188; Smith v. Brotherline, 62 Pa. 461; Densmore Oil Co. v. Densmore, 64 Pa. 43; Lungren v. Pennell, 10 W. N. 297; Phila. Nat. Bank's Ap., 141 Pa. 517. The master [recommended that the bill should be dismissed.] (17)

Exceptions to the master's report were, among others, (3, 12, 17) to the above findings, etc.

The court dismissed the exceptions and confirmed the report.

*Errors assigned* were, among others, (1, 6, 9,) dismissal of above exceptions respectively, quoting them; and (11) entry of decree, quoting it.

*Henry C. Olmsted*, for appellant.

*John G. Johnson*, for E. B. Griffiths.

*Richard P. White*, for Pennsylvania Warehousing & Safe Deposit Company.

OPINION BY MR. JUSTICE STERRETT, October 3, 1892.

In this case, the learned master found and reported the facts together with his opinion as to the law applicable thereto, and recommended the dismissal of the bill. After hearing and consideration of the exceptions filed by plaintiff, the learned court dismissed the same and confirmed the master's report.

The master's findings of fact and conclusions of law, together with the authorities in support of the latter, are so fully presented in his clear and exhaustive report that we find it unnecessary to refer to them in detail.

A careful examination of the pleadings and proofs, aided by the very able argument of the learned counsel for appellant, has failed to convince us that there is any substantial error either in the findings of fact or conclusions of law.

Where, as in this case, the master's findings of fact have been approved by the court, our uniform practice is to treat them as conclusively correct, unless the contrary clearly appears. In this case, we see no reason to doubt their correctness.

After setting forth the circumstances which led up to and

culminated in the sale of his stock, in the Pennsylvania Warehousing & Safe Deposit Company, to defendant Griffiths, who was then secretary of the company, the plaintiff, in the 9th paragraph of his bill, charges that at the time he sold the stock to Griffiths the latter had full knowledge of the negotiations with the Philadelphia & Reading Railroad Co. as set forth in paragraph 6 of the bill, and that he, Griffiths, falsely and fraudulently made the representations to plaintiff set forth in paragraphs 4 and 5 of the bill, with intent to deceive and defraud plaintiff and obtain from him his stock below its real value; that there was a duty on the part of Griffiths, as secretary of the company, either to give to plaintiff truthful answers to his questions for information, or to have remained silent, and that he cannot take advantage of his own fraud and misrepresentations to the damage of the plaintiff. This is the gravamen of his complaint.

In his answer, Griffiths denies that any such inquiries were made by the plaintiff, or that he replied untruthfully. At the hearing before the master, Griffiths was called by the plaintiff, as for cross-examination, and testified emphatically that at the time of the interviews referred to, and when he bought the plaintiff's stock, he had no knowledge whatever of anything pending in the affairs of the company, nor any movement in prospect, likely to increase the value of its stock.

The purchase by Griffiths of plaintiff's stock was concluded by the transfer thereof and payment of the consideration on February 13, 1890. The master finds that at that time the Philadelphia and Reading Railroad Co. had not exercised its option to lease all the piers of the Warehousing Company for a long term; that its intention to do so, if it really existed, had not then been communicated to any of the officers of the Warehousing Company, and was unknown to them and Griffiths. In point of fact, the railroad company had, at least once, up to that time, refused to exercise its option; that the consent of the railroad company was only finally given on February 17, 1890, and the lease was executed on February 19th and acknowledged by the officers of both companies on February 24, 1890, several days after plaintiff sold and transferred his stock to Griffiths.

The master further finds: "It was the unexpected exercise

by the railroad company of its option reserved in the first lease, and the leasing of all the piers of the Warehousing Co. for 99 years at an annual rental of $40,000, which, when it became generally known, caused the price of the stock to suddenly rise."

"At the time Griffiths bought plaintiff's stock, he did not know of anything that was pending, or of any movement, in contemplation, likely to cause a rise in the value of the stock, and, of course, he had no knowledge to impart to the plaintiff which he unfairly or improperly concealed."

He further finds "that Griffiths' only knowledge of the negotiation with the Reading Railroad Co., at the time he bought plaintiff's stock, consisted in the knowledge of the first lease, which was considered rather disadvantageous than otherwise by the officers of the Warehousing Company. The existence of that lease was well known to the stockholders, and Griffiths had a right to assume that it was known to the plaintiff also."

The finding of the foregoing and controlling facts was fully warranted by the evidence, and the same may be said as to other findings of fact, less important to the defence.

There appears to be no error in the application of the law to the facts found by the learned master. It is unnecessary to consider the specifications of error seriatim. There appears to be nothing in either of them that would justify a reversal of the decree.

Decree affirmed and appeal dismissed with costs to be paid by appellant.