CHENERY CORPORATION et al. v. SE-
CURITIES AND EXCHANGE COMMIS-
SION (FEDERAL WATER AND GAS
CORPORATION, Intervenor).

No. 8074.

United States Court of Appeals for the
District of Columbia.

Argued Feb. 10, 1942.

Decided April 27, 1942.

Mr. Spencer Gordon, with whom Messrs. William Merrick Parker and William Du-Bose Sheldon, all of Washington, D. C., were on the brief, for petitioners. Mr. Fontaine C. Bradley, of Washington, D. C., also entered an appearance for petitioners.

Mr. Homer Kripke, with whom Messrs. Chester T. Lane, General Counsel, Christopher M. Jenks, Assistant General Counsel, Lawrence S. Lesser, Special Counsel, and Frederick N. Jones, all of Washington, D. C., were on the brief, all of the Securities and Exchange Commission, for respondent.

Messrs. Charles E. Hughes, Jr., and Allen S. Hubbard, both of New York City, by special leave of court, filed a brief on behalf of Federal Water and Gas Corporation, as Intervenor.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This is a petition to review an order of the Securities and Exchange Commission issued under the Public Utility Holding Company Act of 1935.[1] The order was made on an application filed with the Commission March 30, 1940, for approval of a plan of merger among Federal Water Service Corporation, Utility Operators Company, and Federal Water and Gas Corporation. Federal Water Service Corporation (hereinafter called Federal) is a Delaware corporation, and at the time of filing the application was the owner of securities of subsidiary water, gas, electric, and other properties. At the time in question, Federal had outstanding $5,222,000 of 5½ per cent Gold Debentures due 1954, four series of approximately 160,000 shares of preferred stocks, a little more than half a million shares of Class A stock, and a like amount of Class B stock. Federal's balance sheet showed a capital deficit of approximately four million dollars, in consequence of which, under the laws of Delaware, the payment of dividends on any Class of stock was prohibited. Utility Operators Company (hereinafter called Utility) was a holding company owning all the outstanding shares of Federal's Class B common stock and some 6,500 shares of its preferred stock. Federal Water and Gas Corporation's assets were unimportant, and its entire outstanding stock was owned by Federal. In November, 1937, Federal registered with the Commission, and on the same day filed an application pursuant to Section 7 of the Public Utility Holding Company Act of 1935 for a voluntary reorganization to be accomplished, pursuant to the Delaware law, through an amendment to its charter reducing its capital by a ratable reduction of the stated values of its several stock issues. The purpose was to eliminate its capital deficit and thus to enable it to resume payment of dividends on its preferred stocks. The Commission never formally acted on the application, nor on three other more or less similar plans proposed during the following three years, because, in the opinion of the Commission, Federal's capital was so reduced as to leave no equity for the Class B stock which, under the proposed plans, was to continue with large voting power. This the Commission thought was inequitable under Section 11(b) (2) of the Act.[2]

In January, 1940, the Supreme Court of Delaware decided Havender v. Federal United Corporation, 11 A.2d 331, the effect of which was to declare that under Delaware law preferred stock, together with dividends in arrears thereon, might be converted into new securities through a merger. Taking advantage of this opportunity for a rearrangement of its capital structure, Federal filed with the Commission, in March, 1940, a new application and declaration setting forth a plan of reorganization involving the merger of Utility and Federal Water and Gas into Federal. The former two filed declarations in accordance with the proposed merger.

During the period from November, 1937, when the first plan was filed, to June, 1940, some four months after the new plan was submitted, petitioners, who are officers and directors of Federal, and Chenery, a cor-

[1] Tit. 15 U.S.C.A. § 79a et seq.

[2] The Section provides that the Commission may require the company to readjust its structure so as fairly to distribute the voting power of its securities.

poration owned by some of them, purchased approximately 12,000 shares of a total issue of approximately 160,000 shares of Federal's preferred stock. All of the purchases were currently reported to the Commission as required by Section 17 of the Act.[3]

The merger plan, which the Commission ultimately approved on *conditions,* contemplated the elimination of Class B stock and the conversion of the preferred stocks and Class A stock into new common stock with a new par value, the effect of which was to reduce materially the capital of the corporation. The condition to which we have just referred was that no shares of the new common stock should be issued in exchange for shares of preferred stock purchased in the three-year period, 1937–1940, by any officer or director of the corporation; but that the shares so purchased should be surrendered to the new corporation upon payment to the purchasers (petitioners) of the cost price and four per cent interest from the date of purchase. The Commission imposed this condition because it was of the opinion that officers and directors of Federal occupied, during the whole pendency of proceedings before the Commission, a fiduciary relation to the corporation and to its shareholders, as the result of which the purchase of stock,

even though made honestly and after full disclosure and at a fair price at a public sale, was detrimental to the "public interest". The Commission's report points out that under the proposed plan these shares would participate on a parity with other shares of preferred stock, and this the Commission thought ought not in the circumstances to be allowed. The Commission said that, while admittedly the directors did not hold title to the company's stock, they nevertheless owed a duty in dealings with the shareholders as great as "that of a trustee who holds title to a *res* for the benefit of his beneficiaries". On this theory, it concluded that, since a "trustee" may not become the purchaser of property which he holds in trust, neither may the officers or directors of a corporation, under any circumstances or conditions, purchase shares of stock pending Commission proceedings.

This brings us, then, to the question in the case, which is whether these purchases of stock, in the circumstances narrated, were "detrimental to the public interest or the interest of investors" within Section 7 of the Act.[4]

Preliminary to the discussion of this question, it may be helpful to relate briefly the conditions under which the stock was

[3] "Sec. 17. [§ 79q.] (a) Every person who is an officer or director of a registered holding company shall file with the Commission in such form as the Commission shall prescribe (1) at the time of the registration of such holding company, or within ten days after such person becomes an officer or director, a statement of the securities of such registered holding company or any subsidiary company thereof of which he is, directly or indirectly, the beneficial owner, and (2) within ten days after the close of each calendar month thereafter, if there has been any change in such ownership during such month, a statement of such ownership as of the close of such calendar month and of the changes in such ownership that have occurred during such calendar month.

"(b) For the purpose of preventing the unfair use of information which may have been obtained by any such officer or director by reason of his relationship to such registered holding company or any subsidiary company thereof, any profit realized by any such officer or director from any purchase and sale, or any sale and purchase, of any security of such registered holding company or any subsidiary company thereof within any period of less than six months, unless such security was

acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the holding company or subsidiary company in respect of the security of which such profit was realized, irrespective of any intention on the part of such officer or director in entering into such transaction to hold the security purchased or not to repurchase the security sold for a period of more than six months. * * *"

[4] Public Utility Holding Company Act of 1935:

"Sec. 6. [79f.] (a) Except in accordance with a declaration effective under section 7 [79g] and with the order under such section permitting such declaration to become effective, it shall be unlawful for any registered holding company or subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly (1) to issue or sell any security of such company; or (2) to exercise any privilege or right to alter the priorities, preferences, voting power, or other rights of the holders of an outstanding security of such company.

\* \* \* \* \* \*

"Sec. 7. [79g.] (a) A registered holding company or subsidiary company thereof

purchased. When the first plan was proposed, members of the Commission's staff objected to the retention of voting power in Federal by its Class B common stock, substantially all of which belonged to Utility Operators Company, which in turn was controlled by officers and directors of Federal. This opposition held in suspense for two and a half years the proposed plan and various subsequently suggested amendments. Notice of the Commission's position in this regard was made public both by the Commission and Federal, and it is agreed was known and understood by stockholders or investors. Realizing that if the Commission persisted in this stand the officers and employees of Federal who had invested in this class of stock would find themselves without either a stake or influence in the company they had helped create and by which they were employed, Chenery, president of Federal, suggested to many of them that they use what money they could spare to buy preferred stock; stating that he would follow the same course. This resulted in purchases over a period of two and a half to three years on the part of various officers and directors of the corporation. The average purchase of each of the 16 officers and directors, other than Chenery and one Vandenberg was around 130 shares. Chenery, for the account of a family corporation controlled by him, purchased approximately 8,000 shares, of which a lot of 2,700 shares was not a purchase but an exchange for $100,000 of Federal's prior debenture gold bonds, and as to which the other party to the transaction testified that he preferred to have the bonds to the stock "and today I am very much delighted we made the trade". The remaining director, Vandenberg, who at the time of the merger—we gather from the record—had ceased to be an officer and director of the corporation, purchased in the open market approximately 1,700 shares.

The Commission's brief and argument in this court explicitly declare that the conclusion to outlaw this stock is not "predicated on any finding that petitioners defrauded or failed to make the fullest disclosure to the stockholders from whom they purchased the shares in question." On the contrary, the Commission, very properly, admits that the transactions complained of were consummated without "any ulterior purpose" and equally without any intention to profit personally "in the consummation of the plan through having traded while the proceedings were pending". We have, therefore, a case in which the facts are agreed, the good faith of petitioners admitted, and the decision based squarely on the assumption that the purchase of securities of a corporation by its officers or directors for their own account, pending action on an application for approval of a merger, is "detrimental to the public interest" as that phrase is used in Section 7(d) (6) of the Act. It is true that the Commission in its brief refers also to the standard "fair and equitable" applicable under Section 11(e) of the Act; but if there is a substantial distinction in meaning or purpose between the phrase "detrimental to * * * the interest of investors or consumers" and the phrase, not "fair and equitable to the persons affected by such plan",—which we think is not the case,—the fact is that the proceedings in the present case were conducted under Section 7 of the Act and the decision expressly rendered under that Section, though the Commission says its conclusion would be the same whether the application is considered under the standards of 7 or of 11. And to this may be added, that there is no finding that the acts of petitioners in this case are unfair or inequitable "to the persons affected" by the plan, but the contrary.

Obviously, therefore, the answer to our question must be found in the light of the standards the statute prescribes, as like or similar "standards" have been interpreted or explained by the courts. In this view, if we are brought to conclude that there was at the time no regulation of the Commission, no provision of the statute, and no rule of common law or equity prohibiting the purchase of stock by an officer or director of a corporation during the pendency of the proceedings we are concerned with; and if there is superadded to this a

---

may file a declaration with the Commission, regarding any of the acts enumerated in subsection (a) of section 6 [79f of this chapter].

 * * * * * *

 "(d) If the requirements of subsections (c) and (g) are satisfied, the Commission shall permit a declaration regarding the

issue or sale of a security to become effective unless the Commission finds that

 * * *

 "(6) the terms and conditions of the issue or sale of the security are detrimental to the public interest or the interest of investors or consumers."

showing of honesty, good faith, and equal knowledge on the part of the sellers, of all the facts and circumstances having any relation to the transaction, all of which the Commission concedes, it would seem logically to follow that the action of the Commission in applying the rule it did was an erroneous assumption of power and an invasion of the legislative field. This brings us, then, to consider whether there is any statute, regulation, or rule of common law or equity which proscribes the present transactions.

 There is no disputing the proposition that under the laws of Delaware the purchase of the shares of stock in a corporation by a director is entirely legal and proper. Cahall v. Lofland, 12 Del.Ch. 299, 114 A. 224; Dupont v. Dupont, 3 Cir., 256 F. 129, certiorari denied, 250 U.S. 642, 39 S.Ct. 492, 63 L.Ed. 1185. This is also the rule in practically all of the other States. The great weight of authority is that a director is not the trustee of stockholders in dealing with one of them for the purchase of his stock, as the term "trustee" is ordinarily used. At most, the relationship is a circumstance which may enter into the question of actionable fraud or deceit.[5] The textwriters, too, all agree that the general rule is that, while directors occupy a trust relation to the corporation, the same relation does not exist as to stockholders—at least in the sale and purchase of their stock. Fletcher on Corporations, § 1168; Thompson on Corporations, § 1258; Cook on Corporations, (4th Ed.) 622; Taylor on Corporations, (5th Ed.) § 698; Beach on Corporations, §§ 246, 614. Indeed, so far as we are able to find, no case has gone to the length of holding a director accountable to a stockholder in the purchase and sale of shares of stock except where fraud or some form of overreaching is shown as the inducing cause of the transaction. Admittedly, there is no rule or regulation of the Commission on the

subject, nor has the Commission ever before sought to enforce an order like the present one. No stronger proof of this can be instanced than the language of the Commission's March, 1941, report, where for the first time the right of the purchasers of the stock was questioned in these words:

"We believe that a formula should be devised which will limit the participation of the preferred stock purchased by the management to an amount which takes into account the purchase prices paid, plus accumulated dividends since the dates of the respective purchases. We do not now attempt to indicate what that formula should be, since the matter is complicated by the fact that the apportionment of stock among the several series of preferred stocks is to be based upon their respective dividend rates and dividend accumulations rather than upon their liquidation values. Our staff will be available for consultation with Federal with respect to this matter, and we shall give further consideration to this question if and when Federal files amendments to its proposal."

Why in the Commission's subsequent report the phrase "purchase price plus accumulated dividends" was deleted and "cost plus 4 per cent" adopted in its place, we have no means of knowing, but the language we have quoted and the facts we have recited unmistakably show that in what is proposed the Commission was adventuring with uncertain steps into a brand new field in which there was neither guide nor compass in the Act or in any administrative practice, either in the Commission or elsewhere.

Certainly this expansion of power cannot be said to conform to the Senate Committee's admonition in reporting the Securities and Exchange Act, that the Commission's authority *must* be administered within the well defined limits of the Act.

Nor is there anything in the Act which changes the established rule, except to the

5 Steinfeld v. Nielsen, 15 Ariz. 424, 139 P. 879; Bacon v. Soule, 19 Cal.App. 428, 126 P. 384; Hooker v. Midland Steel Co., 215 Ill. 444, 74 N.E. 445, 106 Am.St.Rep. 170; Board of Com'rs of Tippecanoe County v. Reynolds, 44 Ind. 509, 15 Am. Rep. 245; Waller v. Hodge, 214 Ky. 705, 283 S.W. 1047; In re Shreveport National Bank, 118 La. 664, 43 So. 270; Blabon v. Hay, 269 Mass. 401, 169 N.E. 268; Walsh v. Goulden, 130 Mich. 531, 90 N.W. 406; Seitz v. Frey, 152 Minn. 170, 188 N.W. 266; Wann v. Scullin, 210 Mo. 429, 109 S.W. 688; Crowell v.

Jackson, 53 N.J.L. 656, 23 A. 426; Carpenter v. Danforth, 52 Barb., N.Y., 581; Krumbhaar v. Griffiths, 151 Pa. 223, 25 A. 64; Commonwealth Title Ins. & T. Co. v. Seltzer, 227 Pa. 410, 76 A. 77, 136 Am.St.Rep. 896; Fisher v. Budlong, 10 R.I. 525; Deaderick v. Wilson, Tenn., 8 Baxt. 108; Haarstick v. Fox, 9 Utah 110, 33 P. 251; O'Neile v. Ternes, 32 Wash. 528, 73 P. 692; Voellmeck v. Harding, 166 Wash. 93, 6 P.2d 373; Poole v. Camden, 79 W.Va. 310, 92 S.E. 454, L.R.A.1917E, 988.

extent we are about to mention. During its consideration by Congress, there was much discussion on the subject of the use by corporate officers of inside information in dealing in its shares. The discussion was general and exhaustive. After extended hearings, Congress settled the problem in Section 17 of the Act, by requiring every officer or director of a registered holding company to report within ten days a statement of the securities owned by him in the company or in a subsidiary and, within ten days after the beginning of each month, to make a like report showing all purchases and sales. This was obviously for purposes of publicity. To prevent the unfair use of "inside information" by the management, Congress further enacted that any profit derived from any purchase and sale or sale and purchase within any holding period of less than six months should inure to the corporation. Senator Fletcher, in reporting the Securities Exchange Act of 1934, 15 U.S.C.A., § 78a et seq., from which Section 17 of the Public Utility Act of 1935 was bodily taken, said of that section:

"The bill further aims to protect the interests of the public by preventing directors, officers, and principal stockholders of a corporation, the stock of which is traded in on exchanges, from speculating in the stock on the basis of information not available to others. Any change in the holdings of such insiders must be reported to the Commission, and profits realized from the purchase and sale, or the sale and purchase of an equity security within a period of less than 6 months are recoverable by the corporation. Such a provision will render difficult or impossible the kind of transactions which were frequently described to the committee, where directors and large stockholders participated in pools trading in the stock of their own companies, with the benefit of advance information regarding an increase or resumption of dividends in some cases, and the passing of dividends in others. * * *

"The principal objection directed against the provisions for corporate reporting is that they constitute a veiled attempt to invest a governmental commission with the power to interfere in the management of corporations. The committee has no such intention, and feels that the bill furnishes no justification for such an interpretation. To make this point abundantly clear, section 13(d) specifically provides that nothing in the act shall be construed to authorize interference with the management of corporate affairs.[6]"

Clearly, the enactment of Section 17 was intended to restrict a recognized existing right and place a definite and certain limitation on its exercise. But subject to its provisions, officers and directors of a corporation are permitted to deal in its securities. Of this, and of the exercise of the right, day after day, without question, there can be no manner of doubt. And this is just a recognition by Congress of the rule that, while officers and directors are trustees for stockholders as a body with respect to the business and property of the corporation and in the management of its affairs, they are not trustees—in the sense we are concerned with here—to the individual stockholder, since they have no control over his shares. Strong v. Repide, 213 U.S. 419, 431, 29 S.Ct. 521, 53 L.Ed. 853; Bisbee v. Midland L. P. Co., 9 Cir., 19 F.2d 24; Dunnett v. Arn, 10 Cir., 71 F.2d 912; Bawden v. Taylor, 254 Ill. 464, 98 N.E. 941; Anchor Realty & Investment Co. v. Rafferty, 308 Ill. App. 484, 32 N.E.2d 394; Seitz v. Frey, 152 Minn. 170, 188 N.W. 266. Of course, they may not manipulate the affairs of the corporation in the interest of themselves or one group of stockholders to the hurt of another, and many courts recognize the duty of full and free disclosure in advance of transactions involving a transfer of shares of the corporation. But the rule goes no further. Strong v. Repide, supra; Trippett v. Polaris Iron Co., 5 Cir., 110 F.2d 362; Westwood v. Continental Can Co., 5 Cir., 80 F.2d 494. In applying the rule, courts have held that an officer may not purchase securities of the corporation without disclosing special facts of which he has knowledge and which tend to affect the value of the securities. But these exceptions and the limitations prescribed by Congress to the general rule are inapplicable here, for it is admitted that there was a full and free disclosure before any purchases were made, the exercise of the utmost good faith throughout, due report to the Commission, the expiration of years, rather than months, after purchase, and no sale. The Commission, however, considers these facts immaterial. It says that "honesty, full disclosure, and purchase at a fair price" are not enough; that in submitting to the Commission a voluntary reorganization plan the directors occupy a fiduciary position toward all the security holders; and that, notwithstanding the fair-

_____

[6] Senate Report No. 792, 73d Cong., 2d Sess., pp. 9–10.

ness of the plan submitted and the exercise of the utmost good faith in its submission, the very fact that it was initiated by the directors places them in the category of a "stockholders' protective committee" or a "stockholders' reorganization committee", as to which the rule is that they may not deal in the securities committed to their care.

Authority for this, the Commission seeks to find in two distinct types of cases. Representative of the first, is Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, followed by American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860, and Woods v. City Nat. Bank & T. Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820. The Pepper case involved a "planned and fraudulent scheme" [308 U.S. 295, 60 S.Ct. 241, 84 L.Ed. 281] by the dominant stockholder of a corporation to defraud other creditors in prosecuting an alleged claim for accrued salary. The Avon Park case involved a fiscal agent of a municipality who was also a creditor, and who concealed this dual relationship from other creditors. In the Woods case, counsel representing conflicting interests was asking compensation for services in the litigation. Furthermore, all three cases arose under the national bankruptcy law.

In the Pepper case, Mr. Justice Douglas announced certain general rules applicable under the equitable powers of the bankruptcy court, which were later—speaking generally—adopted and approved in the other two cases. He said:

"A director is a fiduciary. [citing case] So is a dominant or controlling stockholder or group of stockholders. [case citation] Their powers are powers in trust. * * * Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [citation] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside."

There can be no quarrel with this statement, and we have always so understood the law to be. The question is its application in the facts of this case. Granting that a director is a fiduciary as to his dealings with the corporation, is very far from saying that a director may not purchase shares of the corporation, and the Supreme Court has said nothing to that effect. Indeed, that it had no such purpose is shown by the "test" which it applies to determine the legality of a transaction between a director and the corporation itself, namely, that it shall be "an arm's length bargain". Applying that formula here, the Commission itself has taken the case out of the category of transactions which cannot stand, for it admits that this was an "arm's length bargain". Moreover, this is not a bankruptcy case nor a case for the intervention of the equitable powers of the bankruptcy court. Though again, it is difficult to see that, if it were, that fact, in the circumstances we are considering, would make a difference.

In the second class of cases to which we have referred and to which the Commission seeks to liken petitioners, In re Paramount-Publix Corp.[7] is an example; but we think the resemblance is too attenuated to be real, for in that case an unqualified rule against trading in the shares of a bankrupt corporation was distinctly placed on the ground that, having assumed the duty of representing the depositing stockholders, the committee became the alter ego of the shareholder and was bound, as an attorney would be, by an obligation to refrain from dealing with the properties committed to his care. In that case, as in the case of In re Republic Gas Corporation,[8] the individual security holders had deposited their securities under a power of attorney which conferred on the committee comprehensive powers, including authority to take all steps necessary to a reorganization and also the power to fix their own compensation. This, as the Supreme Court said in Bullard v. Cisco, 290 U.S. 179, 54 S.Ct. 177, 180, 78 L.Ed. 254, 93 A.L.R. 141, was the equivalent of depositing the securities "into an express trust, to be managed and administered by * * * trustees, for the purpose of conserving, salvaging, and adjusting the investment". But the pattern in this case bears no resemblance to that. The difference between petitioners and a stockholders' committee created to protect its members in winding up or reorganizing an insolvent corporation is striking and obvious. Here, as to the purchases made by petitioners, there is no express trust in which petitioners are trustees, nor are petitioners agents of, nor do they speak for,

---

[7] D.C., 12 F.Supp. 823. [8] D.C., 35 F.Supp. 300.

310

the shareholders in the proceedings before the Commission. They merely propose the plan—as to which, of course, honesty and fair dealing must be shown—and in the present instance is admitted. The approval is for the Commission, and the confirmation is by act of the stockholders in accordance with State law and in which two-thirds must agree, with the right on the part of a dissenting stockholder to have an appraisement and the value of his shares in cash. The directors' functions are thus wholly different from those of the reorganization committees, to which the courts apply the rule of trustee and beneficiary.

■ Here we have a case in which the record shows a going corporation with large assets and a money-making record, but which, by losses in previous years, had sustained a capital deficit which prevented the carrying out of its obligations to its preferred stockholders. Its directors, with the object of a resumption of dividends, proposed a plan valid under the applicable State law, for the ratable reduction of its capital structure, the result of which would have been, if approved by the Commission and stockholders alike, to leave the equities precisely as they were in the beginning. Pending action by the Commission, practically the entire issue of each class of preferred stock changed hands in the open market, and there was full knowledge or opportunity of knowledge on the part of buyer and seller alike of the exact situation. The position of petitioners in this respect was the same—no better, no worse—than the position of the other buyers of the stocks. The Commission informally refused to give its approval to the plan or the various amendments proposed from time to time, as it had a right to do. A new and different plan was then proposed, to which the Commission gave approval, and authorized a corporate meeting that the stockholders might express their wish to adopt or to reject it. During all of this time, some officers of the company, to protect their investments in the company, purchased in good faith, in the open market, approximately 7½ per cent of the preferred stock, and as each purchase was made, reported its terms to the Commission, as the Act required, and the Commission, without protest, released notice of the same to the public. But in its final approval, the Commission, solely for the reason that these purchases were made by men who occupied an official relation to the company, says the transaction is unlawful, and accordingly

places the participants in a less favorable position than the hundreds of private purchasers who acquired their shares on exactly the same basis.

This position the Commission defends, not on the ground that the Act of Congress authorizes the exertion by it of such power, but upon a rule of convenience which the Commission is of opinion should obtain. Starting with the premise, which nearly everyone admits, that there have been abuses by officers and directors of corporations in the manipulation of the stocks of their corporation, in the suppression of information in relation to the financial condition of the corporation, and in the use of information not generally available, the Commission says that it is better that the cause of this evil should be prohibited than that the Commission should be relied upon to apply the remedy in particular cases by inquiring into all the circumstances of the case to determine whether there has or has not been fraud in fact. Since the Commission would, and in this case has, substituted a rule of its own for that which Congress, after considering the subject in all of its various angles, covered in Section 17 of the Act, the question narrows itself to the validity of this Commission action. And we think that question must, on reason and authority, be answered negatively. This apparently was also the view of the Commission until it cut the Gordian knot in the present case, for in its report of August 7, 1941, recommending amendments, it acknowledged that:

"It is only when the insider makes a profit within the relatively short period of 6 months that this profit is required to be turned over to the corporation."

And that the Commission thought this was sufficient to strike at the root of the evil is shown by the statement of Chairman Purcell to the House Committee on Interstate Commerce (January 23, 1942), "that Congress was wise in seeking to deal with the problem" covered by Section 17 (16 in Securities Act) "by expressly prohibiting only the most prevalent form of the abuse of inside information—trading designed to take quick profits from short term market fluctuations". And yet the Commission proposes to annul, not transactions growing out of an abuse of inside information, but transactions as to which both buyer and seller were equally informed of the facts,—not trading designed to take quick profits from short term market fluctuations, but trading for investment by one whose income depended

at least in part upon the success of the corporation of which he was an officer.

That this assumption of authority is contrary to the Congressional intent, we think we have shown, and that such assumption was never contemplated by Congress is clear in the report of Senator Fletcher, to which we have referred, where he says:

"Of course, well defined limits must be indicated within which the authority of such administrative authority may be exercised."

We have pointed out these limits, and now to hold with the Commission would require us to say that a transaction which the general law recognizes as lawful, and to which Congress for reasons of its own has attached conditions, is detrimental to the public welfare, notwithstanding no breach of the conditions is shown. In our opinion, in the enactment of Section 7, the congressional phrase "detrimental to the public interest" was never intended to proscribe an investment made under these circumstances.

In expressing this opinion, we are not saying that the Commission's view is not directed to a desirable end. As to that, opinions of men of experience and probity and judgment will differ widely. But, if the Commission's objective is to be attained, it should be only after the *pros* and *cons* have been carefully weighed in their relation, respectively, to the dangers and the benefits, and the scales should be controlled by Congress and not by the Commission. In short, all that we hold is that this vital question of policy is one for the Congress and not for the Commission. Until Congress acts to change the standard it has expressly set up in the Act, action by the Commission to expand or enlarge its terms, and to make such expansion or enlargement apply to transactions three years old, is we think, with great deference to the Commission, neither more nor less than retrospective legislation.

The order of the Commission is, therefore, reversed and the cause remanded to the Commission for action in accordance with this opinion.

Reversed and Remanded.

MILLER, Associate Justice (dissenting).

The delay in approval by the Commission of petitioners' plan is adequately explained by the following considerations: (1) During the intervening four-year period four plans—fourteen times amended—were submitted to the Commission; (2) but only in the last plan as finally amended was provision made for the elimination of the Class B stock; (3) this Class B stock controlled the voting power of the corporation; (4) it also constituted petitioners' main interest in the enterprise and they were the dominant stockholders because of their control of it; (5) petitioners do not now question the power of the Commission to find that the Class B stock represented no real equity and that it would have been unfair and inequitable to the other stockholders if it had not been eliminated; (6) whatever may have been the motive or the reason for so long delaying the elimination of the Class B stock, it was through no misconduct or nonfeasance upon the part of the Commission; (7) the law gave to petitioners the initiative in preparing and presenting to the Commission an acceptable plan; (8) and it gave to petitioners the privilege of not carrying out the plan even after approval.

The question presented for our decision is whether the Commission had power to impose, as a condition of approval of the plan as finally presented, a limitation upon the extent to which petitioners may profit from the purchase, during the intervening four-year period, of other stock of the corporation. The statute provides specifically that: "Any order permitting a declaration to become effective may contain *such terms and conditions as the Commission finds necessary* to assure compliance with the conditions specified in this section."[1] [Italics supplied] The Commission found it necessary to impose the protested condition in order to secure compliance with the italicized language of the following broad specification of the statute: "* * * the Commission shall permit a declaration to become effective regarding the exercise of a privilege or right to alter the priorities, preferences, voting power, or other rights of the holders of an outstanding security unless the Commission finds that such exercise of such privilege or right will result in an unfair or inequitable distribution of voting power among holders of the securities of the declarant or *is otherwise detrimental to the public interest or the interest of investors or consumers.*"[2] [Italics supplied]

I see no reason for questioning the Commission's finding or for limiting the broad language of the statute as the majority

---

[1] 49 Stat. 817, 15 U.S.C.A. § 79g(f). [2] 49 Stat. 816, 15 U.S.C.A. § 79g(e).

opinion proposes to do. The statute vested a large discretion in the Commission. It is a rule of long standing that the exercise of such discretion should not be disturbed except where it has been abused.[3] The Supreme Court has admonished us on several occasions that the judicial function is a limited one, quickly exhausted,[4] and that courts should not lightly interfere with the performance of administrative duties by the agencies which Congress has created for that purpose.[5] Courts and commissions should play a coordinate role in the administration of justice.[6]

Whether the conduct of petitioners in the present case would be proscribed or permitted by any rule of common law or equity, declared by any court prior to adoption of the acts which created, implemented and empowered the Commission, is of small significance. While it may be entirely proper to look to the common law for definition when the context of a statute so requires,[7] it is improper to do so when the statute deliberately departs from the common law definition[8] or when its purpose would be defeated by adherence to a common law rule.[9] A closely related example is found in the Federal Trade Commission Act. 15 U.S.C.A. § 41 et seq. Justice Stone, speaking for the Supreme Court in Federal Trade Commission v. R. F. Keppel & Bro., Inc.,[10] used language strikingly pertinent to the present case: "The common law afforded a definition of unfair competition and, before the enactment of the Federal Trade Commission Act, the Sherman Anti-Trust Act (15 U.S.C.A. § 1–7, 15 note) had laid its inhibition upon combinations to restrain or monopolize interstate commerce which the courts had construed to include restraints upon competition in interstate commerce. It would not have been a difficult feat of draftsmanship to have restricted the operation of the Trade Commission Act to those methods of competition in interstate commerce which are forbidden at common law or which are likely to grow into violations of the Sherman Act, if that had been the purpose of the legislation. * * * As proposed by the Senate Committee on Interstate Commerce and as introduced in the Senate, the bill which ultimately became the Federal Trade Commission Act declared 'unfair competition' to be unlawful. But it was because the meaning which the common law had given to those words was deemed too narrow that the broader and more flexible phrase 'unfair methods of competition' was substituted. Congress, in defining the powers of the Commission, thus advisedly adopted a phrase which, as this Court has said, does not 'admit of precise definition but the meaning and application of which must be arrived at by what this Court elsewhere has called "the gradual process of judicial inclusion and exclusion."'" The broad and far-reaching standard of public interest which is de-

[3] Interstate Commerce Commission v. Illinois Central R. R., 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280; Alabama Power Co. v. Federal Power Commission, —— App.D.C. ——, 128 F.2d 280.

[4] Rochester Tel. Corp. v. United States, 307 U.S. 125, 139, 140, 59 S.Ct. 754, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 78 L.Ed. 1260; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656.

[5] Board of Trade v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. ——, decided January 5, 1942.

[6] Scripps-Howard Radio, Inc. v. Federal Communications Commission, 62 S.Ct. 875, 86 L.Ed. ——, decided April 6, 1942; United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211; Id. 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 146, 60 S.Ct. 437, 84 L.Ed. 656.

[7] See Apex Hosiery Co. v. Leader, 310 U.S. 469, 494–498, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. American Medical Ass'n., 72 App.D.C. 12, 16, 110 F.2d 703, 707, certiorari denied, 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411; United States v. Cardish, D.C.E.D.Wis., 143 F. 640, 642; Oliver v. United States, 9 Cir., 230 F. 971, 973, certiorari denied, 241 U.S. 670, 36 S.Ct. 721, 60 L.Ed. 1230.

[8] Federal Trade Commission v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 310–312, 54 S.Ct. 423, 78 L.Ed. 814.

[9] Philadelphia, Baltimore & Washington R. R. v. Tucker, 35 App.D.C. 123, 148, L.R.A.1915C, 39, affirmed, 220 U.S. 608, 31 S.Ct. 725, 55 L.Ed. 607; Commissioner of Internal Revenue v. Marshall, 2 Cir., 125 F.2d 943, 945; Missel v. Overnight Motor Transp. Co., Inc., 4 Cir., 126 F.2d 98, 102, 103.

[10] 291 U.S. 304, 310–312, 54 S.Ct. 423, 425, 78 L.Ed. 814.

clared in the present Act, has been used by Congress in earlier legislation and has been liberally interpreted by the Supreme Court to accomplish the statutory purpose. A good example is found in the Transportation Act of 1920,[11] as interpreted in such cases as United States v. Lowden,[12] and Interstate Commerce Commission v. Railway Labor Executives Ass'n.[13]

In the present case, therefore, as in the instances to which reference has been made, courts are obliged to interpret statutory revisions of common law in such manner as to achieve, rather than to defeat their purposes;[14] regardless of the extent to which they may seem to depart from the old common law moorings.[15] An examination of the applicable law and the Committee Reports,[16] in the present case, reveals that it was the intention of Con-

---

[11] 41 Stat. 477, § 402(18), 49 U.S.C.A. § 1(18) ; Id. at page 481, § 407(5) (6), 49 U.S.C.A. § 5(2).

[12] 308 U.S. 225, 231, 232, 238, 240, 60 S.Ct. 248, 84 L.Ed. 208.

[13] 62 S.Ct. 717, 86 L.Ed. ——, decided March 2, 1942. See also, Pacific Gas & Elec. Co. v. Securities & Exchange Commission, 9 Cir., 127 F.2d 378 decided April 14, 1942.

[14] Philadelphia, Baltimore & Washington R. R. v. Tucker, 35 App.D.C. 123, 148, L.R.A.1915C, 39, affirmed, 220 U.S. 608, 31 S.Ct. 725, 55 L.Ed. 607 ; United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 542, 544, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345: "In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. * * * Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts."

See also, Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881: "* * * the construction of every such statute presents a unique problem in which words derive vitality from the aim and nature of the specific legislation."

[15] Pennsylvania Indemnity Fire Corp. v. Aldridge, 73 App.D.C. 161, 117 F.2d 774, 133 A.L.R. 914.

[16] Sen.Rep. No. 792, 73d Cong., 2d Sess. (1934) 1–21. See particularly [p. 3] : "The record compiled by the committee for the first time exposed methods by which a relatively small number of persons have extended their operations in securities far beyond any useful economic function, to the great detriment of the investing public. * * * [p. 11] A memorandum prepared by a corporate official was introduced in evidence which discussed the alternatives of preparing the corporation's annual report in either the 'standard' or the 'understandable' form, the decision being in favor of the former. Many other instances of 'window dressing' were observed, where inexcusable methods were employed to in-

flate assets, obscure liabilities, and conceal deficits."

Sen.Rep. No. 1455, 73d Cong., 2d Sess. (1934) 68 : "The Securities Exchange Act of 1934 aims to protect the interests of the public against the predatory operations of directors, officers, and principal stockholders of corporations by preventing them from speculating in the stock of the corporations to which they owe a fiduciary duty. Every person who is the beneficial owner of more than 10 percent of any class of equity security registered on an exchange or who is a director or officer of the issuer of such security must report to the Commission whenever any change occurs in his ownership of stock in the corporation. In the event that he realizes any profits from the purchase and sale or sale and purchase of an equity security within a period of less than 6 months, he is bound to account to the corporation for such profits. It is also made unlawful for corporate insiders to sell the security of their corporations short or to make 'sales against the box.' By this section it is rendered unlawful for persons intrusted with the administration of corporate affairs or vested with substantial control over corporations to use inside information for their own advantage."

Sen.Rep. No. 621, 74th Cong., 1st Sess. (1935) 59 : "The issuance of new securities by holding companies should be adequately supervised by the commission so that in reorganizations and rearrangements of properties an uninformed investing public shall not have foisted upon it securities which are in no sense secure and carry little or no voice in management. Security issues should be limited to purposes necessary in the public interest, which accords with the ultimate purposes of the legislation ; and each security issued should bear a proper relation to the capital of the company, its existing securities, the securities of the companies in a geographically and economically related system, and, above all, to the prudent investment in the properties of the issuer and its underlying companies. There should be an end to the pyramiding

gress to work sweeping changes in theretofore existing rules governing corporate management, financing and reorganization.[17] Those changes are as far-reaching in their implications as was the abandonment of the common law rule of assumption of risk and the fellow-servant rule, which resulted from enactment of workmen's compensation and industrial accident legislation.[18] Here, as there, the purpose was to protect little people against the aggressions of the dominant group. Consequently, we should look for analogies to other branches of the law in which the legal relationships more nearly approximate those which Congress intended should exist henceforth in the management, administration and reorganization of public utility holding companies.

The obvious analogy, it seems to me, is the relationship which exists between the trustee and his beneficiary. And, in my opinion, the Commission's contention is correct, within the meaning of the Act, that those who undertake to formulate and secure approval of a plan for the readjustment of stockholders' rights thereby assume fiduciary obligations to the stockholders whose rights the plan proposes to affect, and their judgment and conduct in such an undertaking should not be open to influences arising from the possibility of personal profit through the purchase of securities subject to the plan; consequently, that they should not profit, in the consummation of the plan, through purchases made while such fiduciary obligations continue. It is in this sense that such cases as Pepper v. Litton,[19] American United Mutual Life Insurance Co. v. Avon Park,[20] and Woods v. City National Bank & Trust Co.[21] become applicable to the present case. For the same reason an analogy may properly be drawn between the present case and those which prohibit dealing, by a committee member, in securities of the company which he is attempting to reorganize.[22] It is even more important in the present situation, that the supervisory power of the Commission should be recognized, in order that the purpose of the statute may be achieved, because, while in a bankruptcy case there is opportunity for the court, before the estate is finally closed to examine every detail of its administration, in the present case the Commission cannot supervise the consummation of the plan or even require that it be consummated.[23] Its duty, in approving or disapproving, is preventive

---

of holding-company securities. Except for necessary discretionary power in the commission in the case of refunding issues, new securities should be limited to par value common stock, with appropriate voting rights, and to first-lien bonds, i. e., bonds having a first lien either on physical assets of the issuer or upon first-mortgage bonds of operating subsidiaries. In this as in almost every phase of the holding-company problem the ultimate interests of consumers and investors are identical. In a system burdened with overcapitalized and debt-ridden holding companies, the consumers of operating subsidiaries have to support the topheavy structure by paying high rates and by enduring poor service from inadequately maintained plants."

[17] Public Utility Holding Company Act of 1935, 49 Stat. 803, 804, 15 U.S.C.A. § 79a(a) (b) (c).

[18] St. Louis v. United Railways Co., 210 U.S. 266, 294, 295, 28 S.Ct. 630, 52 L.Ed. 1054; Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 58, 112 F.2d 11, 17, certiorari denied, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415.

[19] 308 U.S. 295, 306, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281: "A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S. Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624, 22 L.Ed. 492. * * * While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders."

[20] 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860.

[21] 312 U.S. 262, 268, 269, 61 S.Ct. 493, 85 L.Ed. 820.

[22] In re Paramount-Publix Corp., D. C.S.D.N.Y., 12 F.Supp. 823, 828, affirmed, 2 Cir., 85 F.2d 588, certiorari denied, Palmer v. Paramount Pictures, 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865; In re Republic Gas Corp., D.C.S.D.N.Y., 35 F.Supp. 300, 303, 306.

[23] The power to withdraw declarations filed under Section 7 is impliedly contained in Section 7(b), 49 Stat. 815, 15 U.S.C.A. § 79g(b). The Commission may apply to a court to enforce the consum-

rather than corrective. In other words, the conventional judicial function of decision after the event may, in a case such as the present, become the least important function of an administrative agency. Such agencies are required to look ahead; indeed, they are charged with the duty of prophecy.[24] For this reason it is sufficient for the determination of conditions under which permission is given to enjoy a legislative privilege in the future, that the expert administrative agency in applying a public interest standard, shall find such conditions reasonably necessary to achieve the purpose and to protect the public interest *in the future.* To argue the contrary is no more convincing than to argue that a trustee in the conventional trust situation[25] should be allowed to profit from dealings with the trust res unless it can be shown in each case that there has been overreaching upon his part. The purpose of the law is, in each case, to anticipate and prevent overreaching, rather than to discover and punish overreaching after it has occurred. Any other interpretation of the

law would impose such an intolerable burden upon the Commission as to make the performance of its duties impossible.[26]

Petitioners contend and the majority opinion holds that the Commission's action in the present case is an attempt to experiment in a field preempted by Congress in the enactment of Section 17 of the Act. I find nothing in Section 17 which suggests Congressional intent to limit the broad power conferred upon the Commission in Section 7. If it had been the intention of Congress that the Commission should have no more power, in acting upon proposals such as the one here involved, than to impose, as conditions of approval, the limitations specified in Section 17, it would have been easy for it to speak in those terms.[27] But it did not so speak; and there is no language in Section 17 which, directly or by implication, defines or limits the power of the Commission to impose "such terms and conditions as * * * [it] finds necessary"[28] to insure that the exercise of the privilege, granted by Congress, to file a

mation of a plan for simplification of holding companies only at the request of a company. 49 Stat. 822, § 11(e), 15 U. S.C.A. § 79k(e). It has been held that an application for registration may be withdrawn at any time before it becomes effective, in the absence of prejudice to the public or to investors. Jones v. Securities & Exchange Commission, 298 U. S. 1, 18–25, 56 S.Ct. 654, 80 L.Ed. 1015, Justices Cardozo, Stone and Brandeis dissenting.

[24] Board of Trade v. United States, 62 S.Ct. 366, 372, 86 L.Ed. —— decided January 5, 1942: "And judgment in a situation like this implies, ultimately, prophecy based on the facts in the record as illumined by the seasoned wisdom of the expert body. In this perspective, the Commission had several choices before it—but all inevitably rested upon trial and error." See Pacific Gas & Elec. Co. v. Securities and Exchange Commission, 9 Cir., 127 F.2d 378, decided April 14, 1942.

[25] Michoud v. Girod, 4 How. 503, 557, 11 L.Ed. 1076: "Is it not better that the cause of the evil shall be prohibited, than that courts of equity shall be relied upon to apply the remedy in particular cases, by inquiring into all the circumstances of a case, whether there has or has not been fraud in fact?"

Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151: "The intention is to provide against any possible

selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity."

Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1: "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

[26] See United States v. Trenton Potteries Co., 273 U.S. 392, 397, 398, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Bethlehem Steel Co. v. National Labor Relations Board, 74 App.D.C. 52, 58, 120 F.2d 641, 647; Alabama Power Co. v. Federal Power Commission, —— App.D.C. ——, 128 F.2d 280.

[27] See Federal Trade Commission v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 310, 54 S.Ct. 423, 78 L.Ed. 814.

[28] 49 Stat. 817, § 7(f), 15 U.S.C.A. § 79g(f).

316

declaraton with the Commission,[29] shall not be detrimental to the public interest or the interest of investors or consumers.[30] In fact, to limit the language of Section 7 in the manner proposed would deprive it of meaning and defeat one of the larger purposes of the Act. Consequently, in my opinion, the petition should be denied.

---

[29] 49 Stat. 815, 814, §§ 7(a), 6(a), 15 U.S.C.A. §§ 79g(a), 79f.

[30] 49 Stat. 816, § 7(e), 15 U.S.C.A. § 79g(e).